## MEDALLION OIL CO. v. HINCKLEY et al.

### No. 8302.

Circuit Court of Appeals, Ninth Circuit.

Aug. 30, 1937.

Rehearing Denied Oct. 22, 1937.

Sutherland, Dearing & Jertberg and Gilbert H. Jertberg, all of Fresno, Cal., and Marvin Osburn and Kenyon F. Lee, both of Los Angeles, Cal., for appellant.

Michael F. Shannon and Thomas A. Wood, both of Los Angeles, Cal., for appellees Universal Oil Land Co. and California Kettleman Oil Royalties, Inc.

Martin J. Weil and W. L. Appleford, both of Los Angeles, Cal., for appellee General Petroleum Corporation.

P. C. Black, of Los Angeles, Cal., for appellees Coast Land Co., Marland Oil Co., and Continental Oil Co.

·Wm. M. Cannon and Warren Olney, Jr., J. M. Mannon, Jr., and Edwin S. Pillsbury, all of San Francisco, Cal., for appellee Hinckley.

James P. Sweeney, of San Francisco, Cal., for appellees Baldy and Clark.

Jesse G. Benson, of Oakland, Cal., for appellee Elizabeth Ochsner.

Albert C. Agnew, of San Francisco, Cal., for appellee Frances A. Ochsner.

Charles F. Rafferty, of San Francisco, Cal., for appellee Simpson.

Sullivan, Roche & Johnson, of San Francisco, Cal., for appellee F. C. Dougherty.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The appellant brought suit to determine and quiet its title to certain oil lands and leases, for an accounting, for the appointment of a receiver, and for general equitable relief. From an adverse judgment in the court below, this appeal was taken.

While the record is voluminous, it permits of a fairly brief summary of the salient facts.

W. H. Ochsner was a consulting geologist. W. P. Dunham was a financier and promoter. In January, 1910, a contract was made between Dunham and Ochsner, pursuant to which Ochsner was employed by Dunham for the purpose of prospecting oil lands, or lands presumed to be valuable

for petroleum, and obtaining options or other rights therein. Ochsner was to direct his efforts as Dunham might instruct, or in conformity with his own judgment. All properties acquired during the life of the agreement were to be for the sole benefit of Dunham and his assigns. As compensation for his services Ochsner was to be paid $400 per month and his necessary traveling expenses, plus a 3 per cent. interest in properties acquired, or a similar percentage in stock of any corporation to which such properties might be transferred.

Ochsner turned his attention to the then unproven field in the Kettleman Hills, in Fresno, and Kings counties, Cal. The lands in the Kettleman Hills were at that time part of the public domain. Numerous individuals had located claims there under the placer mining laws. Ochsner, directly or through others, dealt with a number of these claimants and obtained from them contracts for the sale of their mineral locations, embracing in all several thousand acres. These contracts provided for the drilling by the purchaser of a test well and for the keeping up of assessment work necessary to maintain the locations in force.

Information concerning the Kettleman Hills anticline and its oil possibilities had been widely disseminated prior to 1910 through government bulletins and scientific publications. By an order dated September 27, 1909, President Taft had withdrawn from entry all lands in that area; and because of this withdrawal doubts existed concerning the continued effectiveness of locations theretofore made and on which work had not been diligently prosecuted. The validity of the withdrawal order was itself questioned, but was upheld in 1916 in United States v. Midwest Oil Company, 236 U.S. 459, 35 S.Ct. 309, 59 L.Ed, 673.

In March, 1910, Ochsner submitted to Dunham a report of his activities and recommended the drilling of a test well on the land contracted for. Dunham thereupon organized the Medallion Syndicate, the members of which subscribed a total of $100,000 for the purpose of exploring the project. This group included, besides Dunham and Ochsner themselves, such well-known figures as Bernard M. Baruch, and two of his brothers, of New York, Daniel C. Jackling and Charles M. Mac-Neill, Utah copper men, and N. Bruce Mc-Kelvie, New York investment banker. The group as a whole was composed of well-informed and wealthy individuals.

The appellant, Medallion Oil Company, was then organized under the laws of Arizona with a capital stock of 100,000 shares of the par value of $1 each. This corporation subsequently qualified to do business in California. The funds of the syndicate were expended through the corporation. With Ochsner as superintendent for the company, a well was spudded in, in October, 1910, and drilling proceeded until the middle of the following year when the Medallion well reached a depth of about 4,100 feet without the discovery of oil or gas.

The original sum raised was by this time exhausted, and the Medallion Oil Company owed debts in excess of $8,000 in addition. In a report to Dunham in July, 1911, Ochsner recommended that the well be drilled to an adequate test of 4,500 to 4,700 feet, estimating that a further sum of $15,000 would be necessary for this purpose. A month later Dunham reported to the members of the syndicate that there had been no response, except on the part of himself and one other member, to an assessment levied to provide additional funds, and that he had decided to shut down all operations. Dunham in this report urged that a thorough test be made of the well and stated that the members must determine without delay whether to continue or quit. This plea, so far as the record shows, was ignored.

During this same period two other concerns were drilling in the vicinity. The well of one had reached a depth of 4,480 feet when insuperable mechanical difficulties brought about its abandonment. The other venture was likewise abandoned because of alarm over the apparent depth to production.

In January, 1912, the promoters of the Medallion well interested two oil men, Garrett and Watson, in the making of a further effort. A contract was entered into between the Medallion company and these men, pursuant to which the latter were to pay the current obligations of the company and to spend such additional sum up to $22,500 as might be necessary to drill the well to a depth of 5,000 feet. For their efforts Garrett and Watson were to receive 45,000 shares of the stock of the Medallion Oil Company, and, in the event oil should not be discovered, they were

to receive in addition all the personal property of the appellant corporation, namely, the salvage value of the drilling equipment and other property installed on the ground. The Garrett and Watson stock was to be made up through a 45 per cent. reduction in the agreed holdings of all others interested in the company. Garrett and Watson were made members of the board of directors of the Medallion Company as one of the arrangements growing out of the new contract. Ochsner also became a director at that time.

The drilling operations of 1912 which followed this contract were accompanied by a series of unfortunate accidents and resulted in no further extension of the well in depth. In addition to the original amount arranged for, there was spent during this year a still further sum of $15,000, which was contributed in equal portions by Garrett and Watson on the one hand and by some of the members of the syndicate on the other.

The Garrett contract appears to have represented a final effort on the part of the Medallion Oil Company to prove the possibilities of its holdings. No work was prosecuted beyond the year 1912. The last known payment to Ochsner on account of his salary had been made in August, 1911. The last recorded meeting of the directors of the company was held in January, 1913. Its franchise fees, required by the laws of the state of Arizona, were unpaid for the year 1913, and in 1915 the corporation forfeited its right to transact business in California. At the end of 1912 the Medallion Company was insolvent and there ensued disputes among claimants concerning the right to salvage its movable property.

Pursuant to the contract with Garrett and Watson a bill of sale of the personal property of the company had been given to the two men, and this they had hypothecated to a bank as security for a loan. The bank prepared to remove this equipment; and for the purpose of preventing such removal Ochsner early in 1913 brought a friendly suit against the Medallion Company for his salary and for moneys advanced by him, including in the suit an assigned account for professional services of one Thayer, who was the legal adviser and a director of the company. A judgment was obtained in this suit, and the property and claims of the appellant were levied on and bought in by Ochsner.

Later, in 1914, Ochsner brought a second suit against appellant to recover some $7,000 on account of moneys alleged to have been advanced to the company. A judgment was obtained in favor of Ochsner in this action, and in 1920 another suit was instituted for the purpose of keeping the judgment alive, but the latter action was not further prosecuted. This judgment remained unsatisfied.

Following 1912 the Kettleman Hills appear to have been deserted by all oil operators, and active drilling was not resumed there until 1923. As for the Medallion, its derrick, buildings, and equipment were removed, and it took on the aspect of an abandoned enterprise. After the failure of the project, Dunham spent most of his time until 1918 in London and New York. In the latter year he suffered severe financial reverses, after which he entered the oil business in Kansas, and later in 1921 or 1922 raised a large amount of money to drill an unsuccessful well in Texas. He died in 1924. For a few years following 1912 he endeavored, without success, to refinance the Medallion.

Ochsner retained his faith in the oil possibilities of the Medallion. In a report made by him to Dunham in September, 1913, he reviewed the history of the Medallion well and remarked that the members of the company were unfortunate in that they lacked the determination and courage to redrill the hole and obtain ultimate success. In the years 1913 to 1915 he sought to interest others in the refinancing of the Medallion; and as late as 1920 he wrote to a man connected with the earlier enterprise concerning plans for a "reassociation" in oil developments in the Kettleman Hills. On several occasions during this period he went to Washington with the view to promoting legislation in the interest of those claiming title to oil lands. Dunham, up to 1917, knew of Ochsner's activities, and there are some general assurances on Ochsner's part, in letters and otherwise, that he was keeping in mind the interests of the Medallion group. These trips of Ochsner were purely voluntary and were made at his own expense.

On February 25, 1920, Congress passed the Oil and Gas Leasing Act, 41 Stat. 437, 30 U.S.C.A. §§ 181, 221 et seq. Sections 18 and 19 of this act (30 U.S.C.A. §§ 227, 228) gave preference rights for a period of six months to bona fide occupants or

claimants of oil or gas lands under claims initiated prior to any withdrawal of such lands from location or entry. This six-month preference period expired August 25, 1920, and was never extended.

In November, 1920, Ochsner made application to the Department of the Interior for a prospecting permit under this act. In his application he stated that he and associates had drilled a well known as the "Medallion" on the land applied for, and he appended a log of the well together with a statement of expense. Since his application was not made under sections 18 or 19 of the act, it is apparent that his reference to these earlier activities was not for the purpose of inducing the Department to grant him preferred rights, but was intended as a recital of his personal qualifications. The statement is contained in a paragraph in which he relates his experience as a geologist and oil operator and his standing as a businessman. In April, 1921, a permit was granted him.

The application and permit covered part, but not all, of the land that had been included in the earlier Medallion project. Thayer, an attorney who had been a director and the legal adviser of the Medallion Company at the time it ceased operations, was senior member of a firm which drafted an application for Ochsner for these lands. The permit, however, was actually issued pursuant to another application presented about the same time by one Dougherty on Ochsner's behalf. Watson, who was also a director of the Medallion Company, knew at the time that Ochsner had obtained this permit. Neither Thayer nor Watson made any question concerning the propriety of Ochsner's course in securing the permit for his own purposes.

Ochsner's permit required that drilling operations be begun within six months, and within one year a well was required to be drilled to a depth of at least 500 feet. Ochsner was apparently unable to interest capital immediately, but in August, 1923, he assigned his permit to appellee Coast Land Company, pursuant to a contract under which this company agreed to drill a well on the land to a depth of 5,000 feet. Ochsner retained certain overriding royalties which he later assigned to appellee Universal Oil Land Company in return for stock. In October, 1923, the Coast Land Company assigned the Ochsner contract and permit to appellee General Petroleum Corporation. Applications for extension of time in which to comply with the terms of the permit were made to the Department, and protested by another party seeking a permit for the same land; and the General Petroleum Corporation proceeded under pressure to the development of the ground. This appears to have been the first effort on the part of any one to engage in active drilling in the Kettleman Hills since the year 1912.

The drilling operations of the General Petroleum Corporation continued until a depth of 6,434 feet was reached and more than $300,000 had been expended. No oil or gas in commercial quantities was developed and the well was abandoned in 1926. Thereafter appellee General Petroleum Corporation of California, the successor of General Petroleum Corporation, undertook the drilling of a second well on the land included in the Ochsner permit, expending more than $650,000 in this venture. This well was brought in, in April, 1929, as a successful producer. Late in 1928 another well, known as the Milham, had been brought in to valuable production in the Kettleman Hills at a point some miles distant from the old Medallion, this being the first actual discovery of oil in commercial quantities in that region. Subsequent to its discovery the General Petroleum Corporation of California was granted a lease for the lands included in the Ochsner permit.

Ochsner died in 1927. Early in 1929 J. W. Dunham, a son of the W. P. Dunham who was the original promoter of the Medallion project, learned of Ochsner's death and of his having left what was reported to be a considerable estate. He also learned at that time through inquiry at the United States Land Office at Sacramento of the issuance of the Ochsner permit. During the next few years the younger Dunham, who had himself been familiar with the operations of the Medallion beginning with 1910, pursued a search for evidence on which to base a suit against the Ochsner heirs and the parties who had become the ultimate beneficiaries of the permit. In 1933 he revived the Medallion Oil Company by taking up its delinquencies under the Arizona law. He then called a meeting of some of the stockholders of the company, at which meeting a board of directors was elected. On April 19, 1933, this suit was commenced.

The trial court found as a fact, and concluded as a matter of law, that appellant,

Medallion Oil Company, has no title or interest in the prospecting permit issued to Ochsner or in any rights or leases growing out of this permit, and that none of the respondents holds property of any kind in trust for appellant. It was further found that appellant had abandoned its claim to the property; that it is estopped to assert any claim; and that any rights it may have had are barred by laches and by various provisions of the statute of limitations of the state of California.

A reversal is asked on the asserted ground that Ochsner remained under obligation to act for appellant, or at least to refrain from acting in his own interest, in relation to the disputed property. It is claimed that he was prohibited from using, except in the interest of appellant, information gained as its agent and employee concerning the location, value, and character of that property; and that the acquisition of the permit for himself, without the knowledge of his principal, charged the permit in his hands and in the hands of his successors with a constructive trust.

Appellant relies on the doctrine of cases, of which Trice v. Comstock, 121 F. 620, 61 L.R.A. 176 (C.C.A. 8th), is an example, to the effect that, when one person is placed in such relation to another that he becomes interested for or with him in any property, he is in such fiduciary relation with him as to be prohibited from acquiring rights in such property antagonistic to the person with whose interest he is associated; and if, in violation of this inhibition, he acquires any property or interest by means of interest or information obtained through the fiduciary relation, thereby preventing or hindering his associate in accomplishing the object of the agency, the property thus acquired is charged with a constructive trust for the benefit of the associate.

■ 1. The appellant corporation was a mere instrument of the individuals who financed the Medallion enterprise. This corporation fell into debt and its funds were exhausted. Its property and rights were levied on and sold, and its charter was permitted to lapse. Ochsner's contract of employment with it was breached by the failure of the company to pay the wages owing him as superintendent, and was terminated by the company's insolvency. Under these circumstances it is not credible that the backers of the Medallion Company expected Ochsner to pursue through the years, in their interest and at his own expense, a project which they themselves had forsaken.

The situation existing in the years 1920 to 1923 appears not to have been different from that with which the Medallion group had been familiar ten years earlier. Nothing seems to have occurred in the meantime offering any greater hope of success. Capital was as badly needed and the risks of ultimate failure were apparently as great as ever.

The passage of the Oil and Gas Leasing Act of 1920 was an event of surpassing interest and importance to oil people everywhere, more particularly to those who claimed rights in California. W. P. Dunham could not have been unaware of this legislation, but he apparently preferred to confine his efforts to fields other than California. So far as disclosed, no other members of the Medallion Company made any attempt to establish its preferred status in respect of the lands formerly explored, nor do they appear to have retained sufficient curiosity in the subject to inquire, then or later, whether any one else had done so.

The lethargy into which they had sunk was clearly not induced by Ochsner. He may not have attempted to rouse them from it, but on this point the record is silent. Some of the members of the syndicate were still living at the time of the trial. None of them testified. As elsewhere pointed out, Thayer, one of the syndicate and a director of the company, and Watson, a late-comer and also a director, not only knew of the application Ochsner made on his own behalf, but they actually aided him in it.

Ochsner used no knowledge or information concerning the character of the property which was not equally available to others of the company, or for that matter to geologists and oil men generally. He did nothing to hinder or prevent the company or any of its backers from obtaining a permit, and he appears not to have concealed the fact of his having acquired one in his own interest. The whole course of events from 1920 on was a matter of public record, or public notoriety.

The trial court's finding that appellant abandoned the Medallion project and all interest therein is amply borne out by the record. The doctrine of the cases upon which appellant relies is not to be applied in circumstances where the principal has

160

abandoned the subject matter of an enterprise and the agency relationship has terminated.

■ 2. Certainly, when Ochsner obtained the permit in his own interest and shortly thereafter assigned it to the Coast Land Company, there was a distinct repudiation of any agency relationship that may have been thought to persist. The appellant knew or should have known of these facts at or about the time they occurred. It stood idle during the ensuing years while others were proceeding with energy and fortitude, and at great expense, in an attempt to develop the property.

In discussing the peremptory nature of the duty to exercise diligence which rests especially on those claiming ownership in oil properties, the Supreme Court in Twin-Lick Oil Company v. Marbury, 91 U.S. 587, 592, 23 L.Ed. 328, observes: "The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands to-day is worth nothing to-morrow; and that which would to-day sell for a thousand dollars as its fair value, may, by the natural changes of a week or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit."

To similar effect are Patterson v. Hewitt, 195 U.S. 309, 25 S.Ct. 35, 49 L.Ed. 214; Johnston v. Standard Mining Co., 148 U.S. 360, 13 S.Ct. 585, 37 L.Ed. 480; Stevens v. McChrystal, 150 F. 85 (C.C.A. 8th); Socrates Quicksilver Mines v. Carr Realty Co., 130 F. 293 (C.C.A. 9th).

Moreover, Ochsner himself, Dunham, Thayer, and other members of the syndicate whose testimony presumably would have thrown much light on controverted facts had died in the intervening years, and their knowledge of the circumstances had died with them.

Any claim to relief which appellant might otherwise have fairly asserted is clearly barred by laches.

3. The appellant assigns as error the admission over objection of certain evidence. We find no prejudicial error in this connection. On the record, aside from the evidence objected to, the trial judge could not fairly have reached any conclusion other than the one arrived at.

The judgment is affirmed.