## FORBES v. UNITED STATES.

### No. 9799.

Circuit Court of Appeals, Ninth Circuit.

Jan. 30, 1942.

T. B. Weir and Weir, Clift & Bennett, all of Helena, Mont., and H. Leonard DeKalb, of Lewistown, Mont., for appellant.

Norman M. Littell, Asst. Atty. Gen., John P. Hearne, Asst. Atty. Gen., Vernon L. Wilkinson, Atty., Department of Justice, of Washington, D. C., and John B. Tansil, U. S. Atty., of Billings, Mont., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

In response to an application filed in May, 1920, with the Commissioner of the General Land Office the Department of the Interior, under the provisions of the Act of February 25, 1920, c. 85, 41 Stat. 437, commonly known as the Leasing Act, 30 U.S.C.A. §§ 181–221, 223–229, 241, 251–263, issued on September 24, 1920, to J. F. Forbes, defendant-appellant, a permit giving him the exclusive right for two years to prospect for oil and gas on certain public lands located in what is known as the Brush Creek structure, Petroleum county, Montana. Thereafter the permit was extended to September 24, 1924. On or about September 28, 1928, the federal officials demanded that defendant take necessary steps to retain as a water well a certain test well which was drilled upon the lands included in his permit and which was flowing about 100 barrels of water per day, or else to properly abandon said well by plugging. Demand was also made upon defendant's surety. As no attention was paid to these demands, a contract to plug the well was let by the United States Government to the lowest bidder, and in 1932 the Government filed suit against defendant in the United States District Court for the District of Montana to recover, together with interest the sum of $2825, the amount expended in plugging the well. The cause was tried before the court sitting without a jury; and from a judgment entered November 27, 1940, in favor of the Government Forbes has appealed to this court.

Appellant contends that the lower court erred in entering judgment against him for the reasons (1) that there was no evidence to show that he either drilled the well in question or caused it to be drilled; (2) that the evidence established that the geological formation was such that the water tapped

by the well could not migrate to or injure any oil-bearing strata and that therefore the order to plug the well was unreasonable, unlawful, and beyond the statutory authority of the Secretary of the Interior; (3) that the order to plug the well was made after expiration of the permit and as a result could raise no obligation on the part of appellant; and (4) that it was demonstrated that the appellee could have minimized the damages by capping the well for use as a water well at a cost not exceeding $50.

Defendant disclaims liability on the ground that "the Government issued the permit with the water well in question already brought in". In his original answer Forbes admitted that the well was drilled in 1921 by his licensee or assignee, as alleged in the complaint; but when the cause came on for trial (about seven years later), he offered an amendment to his answer to the effect that the well was drilled in 1920, that water had been struck, and that operations had been discontinued before September 24, 1920, the date his permit issued. He alleged that the well was drilled between June 28, 1920, and September 24, 1920, by the Cat Creek Consolidated Oil Company of Montana (hereinafter referred to as "Consolidated") under an agreement with certain persons who had placer claims on the lands; that on August 10, 1920, upon learning that defendant had applied for a prospecting permit on the lands, Consolidated made a drilling contract with him so that all outstanding claimants would be under contract, but that at that time the drilling was already in progress and thereafter the operations were conducted by Consolidated without consulting defendant. At the trial defendant stated that he entered into agreements with the various placer claimants, whereby it was provided that whichever party was awarded by the Government the right to take oil from the lands involved would pay to the other a specified royalty in the event oil should be developed in commercial quantities. The District Court made the finding that "on the prospect and expectation of receiving this permit from the United States Government [defendant] made contracts with the Consolidated Oil Company, a corporation, and others to drill a test well and through these said agents drilled a test well upon lands embraced in the permit * * * to a depth of about 1185 feet, when flowing water was encountered and the well was thereafter abandoned as a non-producer * * *".

There was introduced in evidence a contract between defendant and Consolidated, which was dated August 10, 1920, and which provided that Consolidated was to begin drilling operations within thirty days after the United States Government granted to defendant a permit. The contract provided for the payment of a royalty to defendant in the event of the discovery of oil or gas in paying quantities. As heretofore stated, the permit was granted on September 24, 1920. On September 23, 1922, defendant filed an application for an extension of the permit, stating *under oath* that within six months after the permit was issued, he caused to be installed on the land a drilling outfit and operations were then commenced; that within a year a well was drilled to a depth of more than 500 feet, and that it had been sunk at the time of the application to a depth of approximately 1200 feet. Again, on July 30, 1923, he requested a further extension, the application containing the *sworn statement* that "after the execution of the agreement aforesaid between the said Cat Creek Consolidated Oil Company of Montana and the said J. F. Forbes, a well was commenced on the said lands embraced in the said permit within about twenty-one (21) days from the granting of same, and was drilled to a depth of about 1185 feet, or to what is known as the Kootenai sand, or the known producing sand in that locality, and that said well was dry and a non-producer, and was abandoned, the said well being on the W½ SE¼ of said section twenty-nine (29); * * *". It was upon the strength of these representations that the term of defendant's permit was twice extended.

On direct examination defendant denied that the first application for an extension in time referred to the well here involved. He argued that because the application did not specifically identify the well of which it spoke, it was error to assume that the well in controversy was the one referred to; he claimed that the application had reference to one of two other wells drilled upon the permit lands. But on cross-examination, after counsel for plaintiff had demonstrated that the other two wells were drilled (one) in 1923 and (the second) in 1924, and that therefore neither could possibly have been the one mentioned in the said application, Forbes admitted that the well about which the contest revolves was the basis for his sworn statements in both extension applications. Moreover, the affidavit of J. W. Warren, vice-president and general man-

ager of Consolidated, which accompanied Forbes's first extension application, particularly refers to and describes the well in issue, as does the second application for an extension in time. Defendant, nevertheless, contends that notwithstanding those affidavits the well was drilled before his permit issued and therefore he should not be held liable for the plugging.

The only evidence introduced by defendant to controvert his sworn statements in the extension applications was his own declarations on the witness stand and two contracts, one between the placer claimants and Consolidated, dated June 23, 1920, in which the company agreed to drill a well on the lands within the placer claim, and the other, dated June 28, 1920, by which Consolidated employed one McCarthy to drill a 1,200 foot well for the company "at such place as it may designate".

■ As is seen from the excerpt from the trial court's findings of fact hereinbefore quoted, there was no specific finding with regard to the precise period during which the drilling operations were conducted. Nor do we think it necessary for the purposes of recovery that the Government prove that the well was bored after September 24, 1920. At the time defendant contracted with Consolidated his interest in the permit lands was contingent only, but upon issuance of the permit the contingency became an actuality and his interest was made certain (so far as the terms of the permit allowed); and if the well had produced oil he would have been the beneficiary of the drilling operations because of the royalty provisions in his contract with Consolidated. Any rights which the placer claimants may have had in the land expired on or before August 25, 1920, 30 U.S.C.A. § 228; Medallion Oil Co. v. Hinckley, 9 Cir., 92 F.2d 155, 157, 158; drilling operations were admittedly performed after that date. It is also admitted that the drilling equipment of Consolidated remained on the property after September 24, 1920, and negotiations were being had so that the drilling might continue. Defendant did benefit from the boring of the well in that because of its existence he was enabled to obtain two extensions in the term of his permit. As we have seen, defendant represented the well as being his, and all concerned parties so regarded it. Therefore there can be no question as to the objective soundness of the trial court's finding that defendant through his agents "drilled a test well upon the lands embraced in the permit". Can there then be any doubt that under such circumstances defendant should be held accountable for the presence of the abandoned, unplugged well upon the lands covered by his permit?

### As to the Authority of the Secretary of the Interior to Order the Plugging of Abandoned Wells.

■■ The lands here involved are of the public domain. Under Article IV, sec. 3, cl. 2, of the Constitution of the United States, "The power over the public land thus entrusted to Congress is without limitations". United States v. San Francisco, 310 U.S. 11, 29, 60 S.Ct. 749, 756, 84 L.Ed. 1050. Congress has both legislative and proprietary powers with respect to the public domain (Sinclair v. United States, 279 U.S. 263, 297, 49 S.Ct. 268, 73 L.Ed. 692), and "can prohibit absolutely or fix the terms on which its property may be used". Light v. United States, 220 U.S. 523, 536, 31 S.Ct. 485, 488, 55 L.Ed. 570. To provide for the use of the Government lands by the public Congress has enacted statutes conferring upon executive officers power to handle the administrative details, to prescribe rules and regulations governing the use of the lands in the various localities in order to carry out and fulfill the purposes of the statutes. Such authorizations are not unlawful delegations of legislative power, but amount merely to a conferring of administrative functions upon agents. United States v. Grimaud, 220 U.S. 506, 516, 517, 31 S.Ct. 480, 55 L.Ed. 563; Hampton, Jr., & Co. v. United States, 276 U.S. 394, 406, 407, 48 S.Ct. 348, 72 L.Ed. 624.

The Secretary of the Interior is authorized by the Leasing Act "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this Act" (c. 85, § 32, 41 Stat. 450, 30 U.S.C.A. § 189), which is entitled "An act to promote the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain" (c. 85, 41 Stat. 437). The Act provides that the Secretary shall grant to qualified persons prospecting permits "under such necessary and proper rules and regulations as he may prescribe" (c. 85, § 13, 41 Stat. 441, 30 U.S.C.A. § 221), and that "all permits * * * shall be subject to the condition that * * * the permittee * * * will, in conducting his explorations and mining operations, use all reasonable precautions to prevent waste of oil or gas de-

veloped in the land, or the entrance of water through wells drilled by him to the oil sands or oil-bearing strata, to the destruction or injury of the oil deposits" (c. 85, § 16, 41 Stat. 443, 30 U.S.C.A. § 225). Under the terms of his permit appellant agreed "to carry on all operations hereunder in accordance with approved methods and practice; to use all reasonable precautions to prevent waste of oil or gas developed in the land, or the entrance of water through wells drilled by permittee to the oil deposits, and to carry out, at the expense of the permittee, all reasonable orders of the Secretary of the Interior relative to prevention of waste and preservation of property, and to comply with such regulations as may be issued by the Secretary of the Interior as to methods of operations".

The operating regulations, adopted on June 4, 1920, by the Secretary of the Interior provide, inter alia, that (Rule 5) the district supervisor or his deputy shall have the power "To require the correction, in a manner to be prescribed or approved by him, of any condition existing subsequent to the completion of a well which is causing or is likely to cause damage to any formation bearing oil, gas, or water, or to coal measures or other mineral deposits, or which is dangerous to life or property or wasteful of oil or gas"; that (Rule 6) "The [permittee] shall conform to the terms of the [permit] and regulations and to the written instructions of the supervisor and shall use all reasonable precautions, in accordance with the most approved methods, to prevent waste of oil or gas, damage to formations or deposits bearing oil, gas, or water or to coal measures or other mineral deposits, injury to life or property, or economic waste"; that (Rule 8) "The [permittee] shall not begin to drill, * * * plug, or abandon any well * * * without first notifying the supervisor or his deputy of his plan or intention"; that (Rule 9) "The [permittee] shall keep on the * * * premises or at his headquarters in the field accurate records of the drilling, redrilling, deepening, plugging, or abandoning of all wells and of all alterations of casing, the records to show all the formations drilled through and their content of oil, gas, or water, if any, and the kinds, length, and sizes of casings used in drilling the wells; and copies of such records shall be transmitted to the supervisor by the [permittee] within fifteen days after the first completion of any well or after the completion of any further opera-

tions on it"; and that (Rule 11) "If the [permittee] shall fail to plug properly any dry or abandoned well the supervisor, after giving thirty days' notice to the parties in interest may plug such well at the expense of the [permittee] or his surety". 47 L.D. 552, 553, 554.

■ ■ Appellant has challenged the validity of these rules and regulations, particularly the one providing that the supervisor may require the plugging of abandoned wells. In United States v. Morehead, 243 U.S. 607, 614, 37 S.Ct. 458, 460, 61 L.Ed. 926, the Supreme Court said that "the assertion of its [regulation's] invalidity must be predicated either upon its being inconsistent with the statutes or upon its being in itself unreasonable or inappropriate". And it is a recognized principle of long standing that a "regulation by a department of government, addressed to and reasonably adapted to the enforcement of an act of Congress, the administration of which is confided to such department, has the force and effect of law if it be not in conflict with express statutory provision". Maryland Casualty Co. v. United States, 251 U.S. 342, 349, 40 S.Ct. 155, 157, 64 L.Ed. 297; and see 40 C.J. 890, § 407.

The question presented, then, is whether the requiring of plugging of abandoned wells is "reasonable", whether it is "necessary and proper" in order to "carry out and accomplish the purposes" of the statute.

The plugging of abandoned dry and nonproducing wells has been recognized for a number of years as essential to any oil conservation program. The statutes of the various oil-producing states have uniformly required that abandoned wells be plugged, even when drilled on privately owned land; and many of the statutes require that all abandoned wells be plugged, independently of a showing of possible damage to oil or other mineral strata. 1 Summers, Oil and Gas, Perm.Ed., §§ 71, 72. Textwriters on petroleum production are agreed that, as a conservation measure, abandoned wells should be plugged, especially those in which water has been encountered. In 1923, at the specific direction of the Secretary of the Interior, the Bureau of Mines prepared and published Bulletin No. 232 in the Manual for Oil and Gas Operations, which Bulletin was addressed (p. xi) "To oil and gas lessees under the act of February 25, 1920", and was stated to be "for the purposes of calling to your attention the necessity and feasibility of practicing conservation in drilling

for and in producing oil and gas". Therein, in relation to the abandonment of "drilling wells", it is stated (at pp. 72, 73):

"* * * Although a sand may not produce in one well it may be commercially productive in an adjoining or nearby well. Such a sand in a well that is to be abandoned must be protected from flooding by water and from a possible loss of gas pressure, or from migration of oil and gas. Failure to abandon wells properly has caused great waste in oil fields by permitting the flooding of oil and gas sands with water and the migration of oil and gas. In some fields, until recent years, abandonment usually involved only the pulling of the casing.

"Water, if not plugged off when a well is abandoned, may migrate through the oil sand to adjacent producing wells and eventually ruin them. Gas sands may also be flooded and gas wasted if gas is allowed to escape through the well into the air. * * * If gas and oil escape at the surface, even greater damage is probably being done to underground deposits by infiltering water. The numerous State laws and regulations on the plugging of abandoned wells prove that the damage resulting from failure to plug wells properly has been generally recognized. Every operator should consider the proper abandonment of a well a moral and economic obligation."

The Congress, too, has recognized the importance of plugging abandoned wells by appropriating by the Act of March 26, 1930, c. 92, 46 Stat. 106, $50,000 "for the plugging of abandoned wells drilled on lands the mineral rights of which are the property of the United States". At the trial the Government petroleum engineers testified that it was in keeping with approved methods to properly plug abandoned wells; and defendant's own expert witness stated that plugging was the approved and proper way to abandon wells and expressed himself as being in accord with the Government's regulation requiring plugging. He agreed, further, that "all wells should be plugged if they are abandoned".

■■ From a consideration of the foregoing it is immediately apparent that the measures adopted by the Department of the Interior, hereinbefore set out, tend to conserve and protect the oil, gas, and mineral stores on Government lands and thus "To promote the mining of" mineral substances on the public domain. The conclusion, therefore, is that the regulation requiring

the plugging of abandoned wells drilled on the public lands is in accordance with the provisions of the statute, subordinate to its provisions, and not in conflict therewith, nor unreasonable in itself.

Defendant disputes the liability sought to be imposed upon him in this action on the ground that the federal officials in ordering him to plug the abandoned well and, upon his failure to do so, in charging him with the cost of the operation were acting unreasonably, because, allegedly, there was no showing that injury did, or would, result from the well being unplugged.

■■ The regulation pertinent to the issue provides that after giving notice to the parties in interest the supervisor "may plug such well at the expense of the [permittee] or his surety". Thus a discretionary power is conferred upon the supervisor by the Secretary of the Interior, which is a proper exercise of the administrative authority vested in the Secretary, for conditions may vary in different localities. United States v. Grimaud, supra, 220 U.S. 506, 516, 31 S.Ct. 480, 55 L.Ed. 563. In view of the type of power conferred a fair interpretation would demand that an order requiring plugging of an abandoned well be issued only when there are reasonable grounds indicating possible or actual damage to the mineral deposits. Cf. Goldsmith v. United States Board of Tax Appeals, 270 U.S. 117, 123, 46 S.Ct. 215, 70 L.Ed. 494.

■ Defendant contends that before an order requiring plugging of an abandoned well can be binding upon a permittee, it must be demonstrated as a certainty that injury has already resulted, or will result, to oil deposits or oil sands. Such a position is untenable. In view of the fact that precautionary measures are by their very nature directed toward a prevention of any and all injury, that measure which tends to obviate the actual occurrence of potential or problematical damage is evidently reasonable and appropriate. Furthermore, the reasonableness and appropriateness of the order to plug is to be determined upon consideration of, and in relation to, the surrounding circumstances at the time the order was made.

Although there is some conflict in the evidence, the District Court's finding "that the defendant wholly abandoned said well and failed and refused to use reasonable precautions, or any precautions whatever, to prevent the entrance of water through

said well to the oil sands or oil bearing strata to the destruction or injury of the oil deposits" is well supported. The court made the further finding that "it is difficult to attempt to predict the migrations of water in a sand and the damage that might result". Defendant contests these findings, claiming that there were no oil sands or oil-bearing strata to be injured. But, as the evidence shows and as the District Court also found, the lands under the permit "were in what is known as the Brush Creek structure located within twelve miles of the Cat Creek field which was producing oil and gas in commercial quantities, and in this well * * * and those drilled by others traces of oil were found in the two Cat Creek sands, and * * * the two Cat Creek sands were the same sands in this Brush Creek field and in the Cat Creek field". Further, that there were oil sands which could be damaged is shown by defendant's sworn statement in his application of September 23, 1922, for an extension of the permit, in which he speaks of a "good showing of oil having been found" and of having information "that oil exists and can be produced in commercial quantities". A steady flow of water was coming from the well, and as testified to by both the Government witnesses and the defendant's expert, oil will scatter unless the hydrostatic pressure is maintained. Defendant's expert also stated that in spite of synclines and anticlines it was possible for water to migrate and that therefore the wisest procedure was to plug wells in which water is encountered so as to retain, as far as possible, the water in the sands in which it is found. Government witnesses cited an instance in which a well running an uncontrolled flow of water, under circumstances very similar to that presented in this case, had caused very considerable damage to the oil production in a particular section of the Cat Creek field.

A fact worthy of consideration at this time is that the defendant wholly failed to provide the supervisor with a log or history of the well as required by Rule 9, Operating Regulations of June 4, 1920, hereinbefore set out. Defendant completely ignored repeated requests to submit to the supervisor the necessary information. Thus, due to defendant's neglect the federal officials were deprived of the benefit of any knowledge which might be derived from such log, and were compelled to make a decision based upon the information which they had at hand. In these circumstances the order was reasonable and was a valid exercise of the administrative power vested in the Secretary of the Interior by the Leasing Act.

We might add that in the record there are other points which substantiate the trial court's findings. Defendant produced at the trial what purports to be a log of the well; upon it is the notation: "Trace of Oil reported at 1170 feet and top of first Cat Creek sand". Also, there was introduced in evidence by defendant an agreement between Consolidated and its driller, one McCarthy, which was entered into on November 20, 1920, in contemplation of a resumption of drilling operations, and by which the driller agreed, "by the use of all reasonable diligence and dispatch, * * *, to shut off and case off in the approved manner all water encountered in said hole and now operating therein, and which said water might be a menace or detriment to any oil sand therein", so that it might be determined whether a claimed showing of oil "is a commercial production of oil". During the course of the plugging operations it was discovered that the casing in the well was defective, and there were holes through which the water could seep and thus penetrate into the various strata encountered during the drilling operations.

Moreover, if defendant was dissatisfied with the order directing that the well be plugged, he could have appealed to the Secretary of the Interior for a review of the order, as provided by Rule 19, Operating Regulations of June 4, 1920, 47 L.D. 552, 556. Having failed to pursue the administrative remedies, defendant should not be heard to defend on the ground that in this particular instance the order to plug was unreasonable, particularly in view of the fact that he remained silent while the Government, acting in accordance with the Operating Regulations, proceeded to plug the well, which work necessitated the outlay of a substantial sum of money. Cf. Goldsmith v. United States Board of Tax Appeals, 270 U. S. 117, 123, 46 S.Ct. 215, 70 L.Ed. 494; see also Red "C" Oil Mfg. Co. v. Board of Agriculture of North Carolina, 222 U.S. 380, 394, 32 S.Ct. 152, 56 L.Ed. 240; Petersen Baking Co. v. Bryan, 290 U.S. 570, 575, 54 S.Ct. 277, 78 L.Ed. 505, 90 A.L.R. 1285; Utley v. Petersburg, 292 U.S. 106, 109, 54 S.Ct. 593, 78 L.Ed. 1155; Natural Gas Pipeline Co. v. Slattery, 302 U.S. 300, 309–311, 58 S.Ct. 199, 82 L.Ed. 276.

*Although Issued after the Permit Had Expired the Order Was Obligatory upon the Defendant.*

Defendant maintains that he was not required to comply with the order because it was issued after the permit had expired. He states in his brief: "The cause of action is based in part upon the alleged breach of the conditions of the permit to the effect that the permittee would obey all lawful and reasonable orders of the Secretary of the Interior. There was not any order issued for the plugging of the well until after the expiration of the permit. The permit itself did not require the plugging of the well, and if no order were issued within the life of the permit, no cause of action existed. * * * Here, the breach was not of any direct provision of the prospecting permit. The alleged breach was disobedience of an order which was made after the termination of the contract. In other words, there was no accrued right nor the violation of any of the contract rights which could be claimed by the government in existence when the 'lease' was surrendered by act of law by its own terms."

The untenableness of defendant's position will appear upon consideration of some of the facts of this case. By his permit defendant specifically agreed "to carry out, at the expense of the permittee, all reasonable orders of the Secretary of the Interior relative to prevention of waste and preservation of property, and to comply with such regulations as may be issued by the Secretary of the Interior as to methods of operations". To what extent did defendant comply with the operating regulations promulgated June 4, 1920?

First of all, defendant did not give to the supervisor notification of his plan or intention before he began to drill the well, as required by Rule 8, heretofore quoted. He entirely failed to act in accordance with Rule 9, requiring him to submit a log or history of the well to the supervisor within fifteen days after completion of operations. Furthermore, he chose to ignore numerous requests by government officials that he furnish them with a log or history of the well. And, then, at the time he abandoned the well he wholly neglected to notify the supervisor, as required by Rule 8, so that the supervisor might act to determine what was a proper method of abandonment. In view of these circumstances, which show his neglect, may defendant rightly complain that the order to plug was issued at a late date?

The prospecting permit created between defendant and the Government a relationship akin to that existing between landlord and tenant. See Herrigstad v. Hardrock Oil Co., 101 Mont. 22, 52 P.2d 171. Failure of defendant to plug the well when he abandoned it was similar to an omission on the part of a tenant to fulfill a covenant to repair; it might also be compared with an act of waste, for his neglect exposed the oil sands to possible damage. However the situation is viewed, it must be concluded that defendant's liability dates back to the day of abandonment and not just to the date of the Department's order. After the term has expired, a landlord may bring an action against the former tenant for failure to perform a covenant to repair or for waste committed during the term. Moreover, because the rules and regulations of the Secretary of the Interior have the force and effect of law, it would seem that this order, which was issued in pursuance of the rules and regulations, would also carry with it the force of law.

As a final objection, defendant questions the amount of damages sought to be recovered by the Government. That $2825 was a reasonable sum for plugging the well is not challenged; but defendant takes the position that the well should never have been plugged, that, instead, the Government should have retained it as a water well. He states in his brief that "It was demonstrated that the appellee could have minimized the alleged damages" by capping the well for use as a water well at a cost not exceeding $50. An examination of the facts reveals that this objection is without merit. To begin with, the record shows that defendant was given an opportunity to adapt the well for water purposes, but that he failed to respond to notices sent to him by the Government. Furthermore, the Government agents themselves contacted many persons in the endeavor to find someone who would convert the well into a water well, assume responsibility therefor, and post the requisite bond; no one was found who was willing to do so. It was only after such efforts had proved ineffectual that bids on the plugging operations were called for. If defendant regarded the order as unjust or unreasonable, he should have sought relief by taking a timely appeal to the Secretary of the Interior.

The judgment of the District Court is affirmed.