217 F.2d 843
 Nathan APPLEMAN, Appellant,
v.
KANSAS-NEBRASKA NATURAL GAS COMPANY, Inc., a corporation,
Deerfield Gas Production Company, a corporation,
and Kearney Gas Production Company, a
corporation, Appellees.
 No. 4860.
 United States Court of Appeals, Tenth Circuit.
 Nov. 24, 1954.
Rehearing Denied Jan. 24, 1955.
 
 Howard T. Fleeson and Wayne Coulson, Wichita, Kan. (Homer V. Gooing, Paul R. Kitch, Dale M. Stucky, Wichita, Kan., C. H. Rosenstein, Tulsa, Okl., on the brief), for appellant.
 Robert Martin, Wichita, Kan. (James D. Conway, Hastings, Neb., George B. Collins, Oliver H. Hughes, K. W. Pringle, Jr., and W. F. Schell, Wichita, Kan., on the brief), for appellee Kansas-Nebraska Natural Gas Co., Inc.
 Malcolm Miller, Wichita, Kan. (George B. Powers, Samuel E. Bartlett, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Robert C. Foulston, Robert N. Partridge, and Robert M. Siefkin, Wichita, Kan., on the brief), for appellees Kearney Gas Production and Deerfield Gas Production Co.
 Before BRATTON and MURRAH, Circuit Judges, and RITTER, District Judge.
 MURRAH, Circuit Judge.
 
 
 1
 Nathan Appleman instituted this equitable action for specific performance of an alleged joint adventure agreement with Kansas-Nebraska Natural Gas Company, Inc., to jointly acquire certain oil and gas properties; and to impress a constructive trust upon those properties, subsequently acquired by Deerfield Gas Production Company and Kearney Gas Production Company as alleged instrumentalities of Kansas-Nebraska his joint adventurer. The trial court held that no joint adventure relationship ever existed between the parties, but if so, it was terminated and abandoned. Appleman appeals from a judgment for the defendants. The legal conclusions of the court are based upon extensive findings of fact epitomized as follows:
 
 
 2
 Nathan Appleman was a wealthy New York oil and gas operator in the Hugoton Field, Kansas. Kansas-Nebraska was a pipe line company engaged in the business of wholesale and retail gas distribution to consumers from the Hugoton area. Fin-Ker Oil and Gas Production Company, as a gas producer, held vast acres under lease in the Hugoton Field.
 
 
 3
 In 1946 Fin-Ker and Kansas-Nebraska entered into a gas purchase contract under which Fin-Ker dedicated certain acreage to Kansas-Nebraska for its gas consumption at a graduating price. Kansas-Nebraska was obligated to take 65% of its gas demand in the Hugoton Field from Fin-Ker under that contract for the life of the field. Both contracting parties were dissatisfied with the burdens of the contract and relations between them were not entirely harmonious. For reasons not material here, the Fin-Ker stockholders wanted to sell, and the president so advised Ross Beach of Hays, Kansas, a Hugoton oil and gas operator and utility owner.
 
 
 4
 Beach separately advised his friends Appleman and L. E. Fischer of Kansas-Nebraska, of Fin-Ker's disposition to sell, and brought Appleman and Kansas-Nebraska officials together in a preliminary meeting in Chicago on September 9, 1948, to discuss the Fin-Ker offering. Both parties expressed an interest and agreed to negotiate for the acquisition of the properties under any mutually beneficial plan. Another exploratory meeting occurred September 13, 1948, in Garden City, Kansas, to obtain preliminary information about Fin-Ker, but nothing definite was concluded because Fin-Ker's records were vague and incomplete.
 
 
 5
 The trial court found that no agreement or commitment was made by either party at either of these preliminary meetings to purchase Fin-Ker, or that they would make any such purchase for their joint account.
 
 
 6
 Thereafter, throughout the remainder of 1948 and early 1949, Appleman and Kansas-Nebraska officials negotiated extensively by letter, telephone and over the council table for a possible purchase of Fin-Ker. Proposals and counter-proposals were made by both parties in an effort to arrive at a satisfactory and acceptable plan for the joint purchase of the Fin-Ker properties. On September 23, Appleman by letter proposed that he purchase Fin-Ker and that Kansas-Nebraska purchase a two-thirds interest from him, Kansas-Nebraska to execute a more favorable gas purchase contract. Kansas-Nebraska absolutely refused this proposal on the grounds that it did not better its present position and was not for the best interests of its stockholders.
 
 
 7
 Thereafter, without the knowledge and acquiescence of Kansas-Nebraska, Appleman negotiated with Raymond Kravis, a consulting engineer, who agreed to become associated with him and to take 20% of the Fin-Ker purchase in consideration of his professional services.
 
 
 8
 Appleman acquired schedules and detailed information covering Fin-Ker properties, its corporate organization, and financial condition through correspondence with Fin-Ker officers and employees. He procured schedules of gas reserves and payout projections on the Fin-Ker properties from Kravis and from the consulting engineers of the lending institutions in New York whom he contacted for a loan covering the proposed purchase. The trial court specifically found that none of this information was ever transmitted by Appleman to Kansas-Nebraska, and Kansas-Nebraska was never advised of Kravis' interest in the deal.
 
 
 9
 In October of 1948, Appleman wrote to Kravis suggesting that under his computations, Fin-Ker properties would retire a $6,000,000.00 indebtedness down to $1,000,000.00 in twelve years and that the properties might be purchased on that basis without consideration of any other possibilities, but on the other hand, a deal might be made with Kansas-Nebraska whereby Kansas-Nebraska would purchase the properties with Appleman and Kravis taking ten undedicated locations at a favorable price.
 
 
 10
 At a conference with Kansas-Nebraska officers in Chicago on November 8, 1948, Appleman advised Kansas-Nebraska that he could buy the Fin-Ker stock for $5,000,000.00 plus liabilities and that he had tentatively negotiated a loan with Mutual Life Insurance Company and Empire Trust Company to finance the purchase. It was proposed that Kansas-Nebraska acquire Fin-Ker with the aid of the proposed loan and then convey to Appleman fifteen undeveloped locations for $40,000.00 each, Kansas-Nebraska to buy gas from wells drilled on these locations at a stipulated price with a guaranteed minimum. This proposal was not accepted by either party and Appleman called an officer of Empire Trust on the following day advising him that Kansas-Nebraska wanted the deal, but that he had not decided whether he would give it to them or not.
 
 
 11
 In the meantime, Fischer of Kansas-Nebraska requested opinions from their Washington counsel concerning the attitude of the Federal Power Commission under the Natural Gas Act toward Kansas-Nebraska's purchase of the stock of a producing company. Pursuant to this request, Kansas-Nebraska was advised by counsel in effect that its purchase of Fin-Ker stock might operate to confer Federal Power Commission jurisdiction over the producing properties and that the Federal Power Commission might ultimately fix the rate base on the historical cost rather than the purchase price. Because of these and other complications, Kansas-Nebraska was advised not to enter into any arrangements for the purchase of the stock without a prior ruling from the Federal Power Commission on matters within its purview and from the Bureau of Internal Revenue concerning the tax consequences.
 
 
 12
 Further conferences between Appleman and Kansas-Nebraska occurred during November, 1948. Appleman had procured an option to purchase the Fin-Ker stock at five million dollars plus liabilities, the purchase to be consummated on December 31, 1948. Fischer advised Appleman of the requirements of counsel as prerequisite to the negotiation for any Fin-Ker stock by Kansas-Nebraska. The parties continued to discuss additional plans for the purchase of Fin-Ker stock, exchanging memoranda of various proposals, and on December 1, 1948, Appleman and Kansas-Nebraska negotiated by telephone concerning definite conditions under which Kansas-Nebraska would participate in the proposed purchase. But the memorandum of the telephone conversation showed that all of the negotiations were subject to advance favorable rulings of the Federal Power Commission and the Internal Revenue Department which were then being sought by Kansas-Nebraska's Washington counsel; and there were other conditions specified. The trial court specifically found that Kansas-Nebraska, acting in good faith, was unable to satisfy any of these conditions. In particular the trial court found that counsel for Kansas-Nebraska was unable to procure favorable advance rulings from the Federal Power Commission or from the Bureau of Internal Revenue.
 
 
 13
 After Appleman secured the option to purchase from Fin-Ker, Holmes and Flagg of Kansas-Nebraska commenced nogotiations with Mutual Life Insurance Company and Empire Trust Company for necessary financing. It soon developed that as a prerequisite to any loan, Kansas-Nebraska would be required to contract for the purchase of a stated minimum of gas from the Fin-Ker properties. The trial court specifically found that Kansas-Nebraska never agreed to any such contract, and could not have done so consistently with its market for gas from the Hugoton field.
 
 
 14
 On December 9, 1948, Fischer notified Appleman that in spite of diligence and great expense on its part, no plan for the purchase of Fin-Ker had been developed which met the approval of Kansas-Nebraska's attorneys and accountants. That since it had been impossible to get requisite favorable action by the Federal Power Commission and the Internal Revenue Department, and in view of the excessive demands of the lending agencies, nothing could be consummated before the expiration of the option agreement on December 31, 1948. It was then suggested that if the matter was open for 'further and more deliberate consideration', Kansas-Nebraska would be glad 'to further study the situation'.
 
 
 15
 In response to this communication, Appleman proposed to acquire Fin-Ker on his own account, giving a one-year option to Kansas-Nebraska to purchase one-half at Appleman's cost, Kansas-Nebraska to favorably modify its gas purchase contract. After considerable negotiation, a plan worked out by Fischer and Appleman was submitted to KansasNebraska in Chicago for study and advice of counsel. This plan was thwarted before any definite agreement was reached by Mutual's continued insistence upon a minimum take by Kansas-Nebraska from the Fin-Ker properties. Kansas-Nebraska then proposed a substitute plan of purchase by a newly organized company with requisite capital to require a much smaller loan. This plan was also unacceptable to Mutual.
 
 
 16
 On December 15, before the option to purchase expired on the 31st, Appleman notified Fin-Ker, Empire Trust and Mutual that the negotiations were 'terminated unsuccessfully'. In the latter part of January, 1949, however, Fischer of Kansas-Nebraska and Appleman conferred on a proposal to revive the negotiations under a new option contract, if it could be procured from the Fin-Ker stockholders. After getting verbal consent to a new option contract, when it was actually circulated among the stockholders, the majority stockholder then refused to sign the contract. Appleman was so advised by Fin-Ker attorneys who stated that the matter would be threshed out in the next stockholders' meeting.
 
 
 17
 When Fischer was advised of this turn of events, he wired Appleman of February 11, 1949, to the effect that Kansas-Nebraska 'was no longer interested in lending support to the pending program', but advised they would be glad to consider an offer of further negotiations if he and Fin-Ker had something worth-while and sensible to offer. Appleman acknowledged this wire stating he now considered it 'best to drop the whole matter', but that if at some later date, Kansas-Nebraska wished him to reopen the negotiations, he would be glad to do so.
 
 
 18
 The trial court specifically found that Appleman and Kansas-Nebraska never entered into any agreement or commitment in 1948 or early 1949 to purchase the capital stock of Fin-Ker for their joint account; that the negotiations between Appleman and Kansas-Nebraska were in good faith and at arms length.
 
 
 19
 On March 7, 1949, Appleman wrote Fin-Ker representatives advising them that in view of the new minimum gas price set in the Hugoton Field by the Kansas Corporation Commission, further negotiations for the Fin-Ker stock need no longer depend upon a more favorable gas purchase contract with Kansas-Nebraska. He stated that necessary financing could be secured without Kansas-Nebraska support, and that further negotiations with them would be a 'waste of time.'
 
 
 20
 In April of 1949, L. B. Stableford, a Chicago oil and gas producer, contacted Kravis seeking his professional advice whether Fin-Ker could be purchased at a price considerably less than the amount previously quoted to Appleman. Kravis advised Stableford of his doubt that Fin-Ker could be purchased at less than five million dollars, and told him of the previous unsuccessful negotiations. Stableford entered into an agreement with Kravis and Appleman to the effect that if he could consummate the purchase for the lower price, he would participate to the extent of 30%. Stableford unsuccessfully negotiated with Fin-Ker during April, May and June. When Kravis later advised him that some difficulty had arisen between Appleman and Kansas-Nebraska he ceased his negotiations awaiting further advice from Kravis. Kravis did not further contact him.
 
 
 21
 The trial court found that Kansas-Nebraska was never advised by Stableford, Kravis or Appleman of Stableford's negotiations with Fin-Ker, nor did they recognize any obligation to Kansas-Nebraska in connection with such negotiations.
 
 
 22
 On October 12, 1949, nine months after negotiations between Kansas-Nebraska and Appleman had terminated, Fin-Ker, without solicitation from Kansas-Nebraska, offered to sell for $7,500,000.00, an amount considerably larger than Appleman's commitment. Kansas-Nebraska indicated its interest, but later notified Fin-Ker it could not accept the offer and asked whether other parties could be substituted and Kansas-Nebraska participate only as a gas purchaser.
 
 
 23
 As a result of these negotiations, and acting under advice of counsel, Kearney and Deerfield were organized to purchase the Fin-Ker stock, the purchase negotiations with Fin-Ker for Deerfield and Kearney being conducted entirely by attorneys representing those companies. Kansas-Nebraska was present at the original conference only to announce its inability to purchase Fin-Ker. Dwight Holmes, officer and member of the board of Kansas-Nebraska, resigned and became the sole stockholder and president of Deerfield. Strangers to Kansas-Nebraska became Kearney stockholders. Deerfield and Kearney arranged negotiations of loans with Mutual Life Insurance Company and Empire Trust Company. Kansas-Nebraska made junior loans to the two corporations. These loans were used to purchase the Fin-Ker stock. Holmes, representing Deerfield, and attorneys for Kearney, negotiated a gas purchase contract with Kansas-Nebraska under which some of the objectionable features of the old contract were eliminated.
 
 
 24
 The trial court specifically found that these negotiations for the gas purchase contract were conducted at arms length with both parties acting in their own best interests; that neither Kansas-Nebraska nor any of its officers ever owned any stock in Deerfield or Kearney; that there was no common management, common accounting, or commingling of funds or property; that Deerfield and Kearney have never been instrumentalities of Kansas-Nebraska.
 
 
 25
 Assailing the findings and conclusions of the trial court, the Appellant insists that the undisputed facts of record establish a fiducial relationship between the parties; that such relationship was created by any one of the following circumstances: (1) concert of action to purchase Fin-Ker for the benefit of both; (2) a mere proposal of joint adventure, whether entered into or not; (3) a joint adventure agreement; (4) use of confidential information by Kansas-Nebraska furnished by Appellant.
 
 
 26
 We readily agree that fiducial relationships recognized and enforceable in equity do not depend upon nomenclature; nor are they necessarily the product of any particular legal relationship. Oldland v. Gray, 10 Cir., 179 F.2d 408; Dexter & Carpenter, Inc., v. Houston, 4 Cir., 20 F.2d 647; Grannell v. Wakefield, 172 Kan. 685, 242 P.2d 1075; Lindholm v. Nelson, 125 Kan. 223, 264 P. 50. They may arise out of conduct of the parties evidencing an agreement to engage in a joint enterprise for the mutual benefit of the parties. Medallion Oil Co. v. Hinckley, 9 Cir., 92 F.2d 155; Baker Oil Tools v. Burch, 10 Cir., 71 F.2d 31; Trice v. Comstock, 8 Cir., 121 F. 620, 61 L.R.A. 176; Grannell v. Wakefield, supra; Yeager v. Graham,150 Kan. 411, 94 P.2d 317. But they necessarily spring from an attitude of trust and confidence and are based upon some form of agreement, either expressed or implied, from which it can be said that the minds have met in a manner to create mutual obligations. Blackner v. McDermott, 10 Cir., 176 F.2d 498; Harris v. Morse, D.C., 54 F.2d 109; Shoemake v. Davis, 146 Kan. 909, 73 P.2d 1043; Pomeroy, Equity Jurisprudence, Vol. 2, § 902, page 1875. For the plainest of reasons, agreements establishing fiducial relationships, if not in writing must be clear and convincing. Because of the acuteness of the equitable remedies, courts will not reach out to establish legal relationships from which enforceable equitable rights may flow. A confidential relationship is never presumed and the burden of proof is upon the party asserting it. Lawson v. Haynes, 10 Cir., 170 F.2d 741; Harris v. Morse, supra; Yeager v. Graham, supra; Grannell v. Wakefield, supra; Pomeroy, Equity Jurisprudence, Vol. 3, § 1058, page 2421.
 
 
 27
 Mere concert of action, without more, does not establish a fiducial relationship; Grannell v. Wakefield, supra; Yeager v. Graham, supra. Undoubtedly parties may deal at arms length for their mutual profit. Harris v. Morse, supra. It is only when by their concerted action they willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiducial relationship arises. As we have seen, the trial court specifically found that in all of their negotiations, the parties dealt with each other in good faith and at arms length. From this, the court concluded that no fiducial relationship was ever established.
 
 
 28
 Undoubtedly the parties agreed to negotiate for the acquisition of the Fin-Ker properties, and they did negotiate in good faith. The negotiations encompassed various plans for the acquisition of the properties, and it may be said with reasonable certainty that on or about December 1, 1948, the parties agreed upon a tentative plan for the purchase of the properties and the interest which each would own upon the consummation of the plan. In general outline, Kansas-Nebraska was to acquire all of the stock of Fin-Ker and Appleman was to receive as his part of the bargain, twelve undeveloped locations for $35,000.00 per location with a gas purchase contract with Kansas-Nebraska. This agreement surely measured the scope of the enterprise, but the agreement was subject to and contingent upon the ability of Kansas-Nebraska to secure favorable rulings from the Internal Revenue Department and the Federal Power Commission, and it was also essentially contingent upon financing from the bank and insurance company. Both parties bent their efforts toward the ultimate consummation of the plan. No one seems to seriously challenge the bona fides of their efforts to that end. Despite the 'arms length relationship' between the parties during the period of negotiations, we think they did impose trust and confidence in each other above the morals of the market place. The relationship was such that neither could have acted within the scope of the enterprise to the detriment of the other without violating an actionable duty. In other words, neither could have consummated the plan to the exclusion of the other without an honest disclosure of all of the facts and an opportunity for the other to reap his end of the bargain.
 
 
 29
 But the arrangement whereby they would acquire the properties did not contemplate a joint ownership and a sharing of the profits in the sense that they would be partners or joint adventurers. It clearly contemplated that each would acquire a separate and distinct interest in the properties, after which the joint enterprise would come to an end. It follows, therefore, that the relationship between the parties, whatever it may have been, terminated with the failure of the plan of acquisition, and the parties were thereafter under no mutual obligations with respect thereto. Indeed, it is clear that both of the parties proceeded on that assumption. Their conduct is inconsistent with any other reasonable hypothesis. After admitting that the negotiations had failed and were at an end on February 11, 1949, Appleman reentered the fray. In a communication on March 7, 1949, to Fin-Ker, Appleman pointed out the obstacles to the consummation of the former plan and that he felt there was no 'earthly reason for trying to negotiate' with Kansas-Nebraska any more-- that it was 'probably a waste of time.' He then called attention to the increase in the well head price of gas under the recent orders of the Kansas Corporation Commission and expressed the belief that with that increase 'financing could be secured without resorting to any support from Kansas-Nebraska.'
 
 
 30
 Thereafter he continued to negotiate with Fin-Ker through L. B. Stableford. It is true Stableford, Kravis and Appleman all testified the revived negotiations were merely a continuation of the original joint venture, but the trial court found otherwise and its findings in that respect are amply supported by the evidence.
 
 
 31
 Kansas-Nebraska commenced negotiations with Fin-Ker nine months after the prior negotiations had terminated. It opened negotiations for the purchase of the properties at the instance of Fin-Ker, and it may be fairly said to have caused them to be purchased in the name of Deerfield and Kearney which it caused to be organized for that sole purpose. In the acquisition of the properties the parties acted upon information, some of which was assembled during the prior negotiations. They dealt with the same parties, secured finances from the same sources, and obstacles formerly insurmountable were easily overcome in the new approach.
 
 
 32
 But the two corporations were legal entitles recognized as such for tax purposes; they own the properties and Kansas-Nebraska is not a stockholder. The only tangible benefits accruing to Kansas-Nebraska were a revision of their onerous gas contract and a five-year option to purchase the gas properties from the two corporations.
 
 
 33
 Based upon a finding of fraud, overreaching, or breach of fiducial obligations equity would undoubtedly find a way to reach the subject of the trust property and to reclaim it for the defrauded cestui que trust. But under the findings of the court, which we credit, we do not have a situation in which one co-adventurer connives behind the back of another to acquire the subject property of the venture, as in Dexter & Carpenter, Inc., v. Houston, 4 Cir., 20 F.2d 647, and Probst v. Hughes, 143 Okl. 11, 286 P. 875, 69 A.L.R. 929. Nor do we have an unfaithful trustee of confidential information as in Ohio Oil Co. v. Sharp, 10 Cir., 135 F.2d 303, and Ballard v. Claude Drilling Co., 149 Kan. 506, 88 P.2d 1021. Information upon which Kansas-Nebraska acted was neither confidential nor the property of either Appleman or Kansas-Nebraska individually or both of them jointly.
 
 
 34
 With a clean break between the negotiations that failed and those that succeeded, each of the parties was free to negotiate and to acquire the property for his own account without infringement of any prior relationship. Cf. Medallion Oil Co. v. Hinckley, supra.
 
 
 35
 The judgment is accordingly affirmed.