UNION OIL COMPANY OF CALIFOR-
NIA et al., Plaintiffs-Appellants,

v.

The Honorable Rogers C. B. MORTON,
Secretary of the Interior of the United
States of America, et al., Defendants-
Appellees.

No. 73–1692.

United States Court of Appeals,
Ninth Circuit.

Feb. 24, 1975.

As Amended on Denial of
Rehearing April 29, 1975.

Samuel O. Pruitt, Jr. (argued), Los Angeles, Cal., for plaintiffs-appellants.

A. Barry Cappello, City Atty. (argued), Marvin Levine, Deputy County Counsel (argued), Santa Barbara, Cal., Jacques B. Gelin (argued), Washington, D. C., for defendants-appellees; George P. Kading, County Counsel, Santa Barbara, on the briefs for County of Santa Barbara; A. L. Wirin and Fred Okrand, Los Angeles, Cal., on the briefs, for non-city intervenors-appellees.

## OPINION

Before BROWNING, CARTER and CHOY, Circuit Judges.

CHOY, Circuit Judge:

Four major oil companies brought this action to set aside an order of the Secretary of the Interior denying them permission to construct a drilling platform in the Santa Barbara Channel which they allege is necessary for full exercise of their rights under a federal oil and gas lease. The companies also seek to enjoin the Secretary from further interference with enjoyment of their lease rights. The district court held that the Secretary's order was within his statutory authority and was not arbitrary, capricious, or an abuse of discretion, and dismissed the complaint. We vacate the decision of the district court and remand for further proceedings.

### Factual Background

In February 1968, the four companies (hereinafter "Union") paid over $61 million for oil and gas rights on tract OSC–P 0241. The leased tract lies on the continental shelf in the Santa Barbara Channel, beyond the jurisdiction of the State of California. The Interior Department granted the lease under the authority of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq.

The lease gives Union the right to erect floating drilling platforms, subject to the provisions of the Act and to "reasonable regulations" not inconsistent with the lease issued by the Secretary. Two platforms, A and B, were installed, each supporting many productive wells.

In September 1968, Union sought permission to install a third platform, C. The Secretary approved the application, and the Army Corps of Engineers issued the necessary permit. In January 1969, before platform C was installed, a blowout occurred on one of the wells on platform A. The blowout caused the disastrous Santa Barbara oil spill which killed birds and marine organisms, damaged beaches and seafront properties, and restricted fishing and recreational activities in the area.

On February 7, 1969, the Secretary ordered all activities on this and certain other leases suspended pending further environmental studies. After these studies were completed, the Secretary announced on September 20, 1971, that Union would not be allowed to install platform C, because operation of that platform· would be "incompatible with the concept of the Federal Sanctuary [which the Secretary had proposed to Congress]." He stated that all operations would remain suspended on certain other Channel leases, pending action by Congress cancelling the leases. See Gulf Oil Corp. v. Morton, 493 F.2d 141 (9th Cir. 1973).

The Department formally notified the companies the following month that the Secretary "has determined that the installation of Platform 'C' would be inconsistent with protection of the environment of the Santa Barbara Channel and has directed [the Regional Supervisor] to withdraw the approval of September 16, 1968." This suit resulted. On November 3, 1972, just prior to trial, the Secretary issued a statement further clarifying the environmental concerns contributing to his decision. (see page 752 infra.)

We upheld the Secretary's suspension of the leases pending congressional action in Gulf Oil, supra. Because Congress had not acted within a reasonable time to cancel the leases in question, however, we declared the suspension invalid after October 18, 1972. 493 F.2d at 149. This appeal is limited to the validity of the order withdrawing permission for Union to install platform C.

## The Act

■ The Outer Continental Shelf Act authorizes the Secretary to issue oil and gas leases on the outer continental shelf to the highest bidder. 43 U.S.C. § 1337(a). A lease issued under this Act, like a mineral lease granted under the Mineral Leasing Act of 1920, 30 U.S.C. § 181 et seq., does not convey title in the land, nor does it convey an unencumbered estate in the oil and gas. *See* Boesche v. Udall, 373 U.S. 472, 478, 83 S.Ct. 1373, 10 L.Ed.2d 491 (1963); McKenna v. Wallis, 344 F.2d 432, 440–41 (5th Cir. 1965), vacated, 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966). The lease does convey a property interest enforceable against the Government, of course, but it is an interest lacking many of the attributes of private property. Oil and gas deposits beneath the continental shelf are precious resources belonging to the entire nation. Congress, although encouraging the extraction of these resources by private companies, provided safeguards to insure that their exploitation should inure to the benefit of all. These safeguards are not limited to those provided by covenants in the lease; Congress also authorized the Secretary to maintain extensive, continuing regulation of the oil companies' day to day drilling operations.

■■ Careful study of the Act confirms that Congress intended to exercise both proprietary powers of a landowner and the police powers of a legislature in regulating leases of publicly owned resources. *Cf.* Forbes v. United States, 125 F.2d 404, 408 (9th Cir. 1942). The Secretary, to whom Congress has delegated these powers, may prescribe at any time those rules which he finds necessary for the conservation of natural resources. 43 U.S.C. § 1334(a)(1). Exercising its legislative power, Congress has provided criminal penalties for knowing violation of these rules. 43 U.S.C. § 1334(a)(2). In addition, those rules in effect at the time a lease is executed are incorporated statutorily into the terms of the lease. 43 U.S.C. § 1334(a)(2). The Secretary like a private property owner, may obtain cancellation of the lease if the lessee breaches such a rule. 43 U.S.C. § 1334(b)(1).[1] Violation of rules

---

1. 43 U.S.C. § 1334(a):

(2) Any person who knowingly and willfully violates any rule or regulation prescribed by the Secretary for the prevention of waste, the conservation of the natural resources, or the protection of correlative rights shall be deemed guilty of a misdemeanor and punishable by a fine of not more than $2,000 or by imprisonment for not more than six months, or by both such fine and imprisonment, and each day of violation shall be deemed to be a separate offense. The issuance and continuance in effect of any lease, or of any extension, renewal, or replacement of any lease under the provisions of this subchapter shall be conditioned upon compliance with the regulations issued under this subchapter and in force and effect on the date of the issuance of the lease if the lease is issued under the provisions of section 1337 of this title, or with the regulations issued under the provisions of section 1335(b)(2) of this title if the lease is maintained under the provisions of section 1335 of this title.

43 U.S.C. § 1334(b):

(1) Whenever the owner of a nonproducing lease fails to comply with any of the provisions of this subchapter, or of the lease, or of the regulations issued under this subchapter

and in force and effect on the date of the issuance of the lease if the lease is issued under the provisions of section 1337 of this title, or of the regulations issued under the provisions of section 1335(b)(2) of this title, if the lease is maintained under the provisions of section 1335 of this title, such lease may be canceled by the Secretary, subject to the right of judicial review as provided in section 1337(j) of this title, if such default continues for the period of thirty days after mailing of notice by registered letter to the lease owner at his record post office address.

(2) Whenever the owner of any producing lease fails to comply with any of the provisions of this subchapter, or of the lease, or of the regulations issued under this subchapter and in force and effect on the date of the issuance of the lease if the lease is issued under the provisions of section 1337 of this title, or of the regulations issued under the provisions of section 1335(b)(2) of this title, if the lease is maintained under the provisions of section 1335 of this title, such lease may be forfeited and canceled by an appropriate proceeding in any United States district court having jurisdiction under the provisions of section 1333(b) of this title.

issued after the lease has been executed does not enable the Secretary to cancel the lease, however. The property rights of the lessee are determined only by those rules in effect when the lease is executed. *See generally* Christopher, The Outer Continental Shelf Lands Act: Key to a New Frontier, 6 Stan.L.Rev. 23, 43–47 (1953).

### The Lease

The Secretary's authority to issue conservation regulations binding previously executed leases is clearly expressed in the Act, 43 U.S.C. § 1334(a)(1):

> The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter. . . . Without limiting the generality of the foregoing provisions of this section, the rules and regulations prescribed by the Secretary thereunder may provide . . . in the interest of conservation, for . . . suspension of operations or production. . . .

The lease with Union, however, provided that it was entered into under, pursuant, and subject to the terms and provisions of the [Act], and to all lawful and reasonable regulations of the [Secretary] when not inconsistent with any express and specific provisions herein, which are made a part hereof . . . .

The Secretary granted Union "the right to construct or erect . . . all artificial islands, platforms, fixed or floating structures . . . necessary or convenient to the full enjoyment of the rights granted by this lease . . . ." Union urges that any regulation issued after execution of the lease which denies Union the right to erect platform C is inconsistent with this express provision of the lease and therefore is a breach of the lease agreement. We disagree.

■ Terms of the lease inconsistent with the statute are invalid. The Secretary can alienate interests in land belonging to the United States only within the limits authorized by law. United States v. California, 332 U.S. 19, 40, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); Mammoth Oil Co. v. United States, 275 U.S. 13, 35, 48 S.Ct. 1, 72 L.Ed. 137 (1927); Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917); Beaver v. United States, 350 F.2d 4, 7–8 (9th Cir. 1965), cert. denied, 383 U.S. 937, 86 S.Ct. 1067, 15 L.Ed.2d 854 (1966); Reese v. Virgin Islands, 277 F.2d 329, 332–33 (3rd Cir. 1960). *Cf.* Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947); Housing Corp. of America v. United States, 468 F.2d 922, 925, 199 Ct.Cl. 705 (1972).[2] Congress empowered the Secretary to lease gas and oil rights with the qualification that he would re-

2. The Secretary's issuance of a lease and Union's reliance on its terms do not estop the Government from enforcing statutory provisions contrary to the lease. We will apply the doctrine of estoppel to the Government "if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel." United States v. Lazy FC Ranch, 481 F.2d 985, 989 (9th Cir. 1973). We are very reluctant to apply estoppel against the Government in cases involving rights to public land, however. *See* Beaver v. United States, 350 F.2d 4, 8 (9th Cir. 1965), cert. denied, 383 U.S. 937, 86 S.Ct. 1067, 15 L.Ed.2d 854 (1966); United States v. Cappaert, 508 F.2d 313, 319–320 (9th Cir. 1974). *But cf.,* United States v. Georgia-Pacific Co., 421 F.2d 92 (9th Cir. 1970) (Government estopped from demanding specific performance of agreement to convey real property). Furthermore, in this case, the costs to the public could be enormous if the Secretary were estopped to maintain continu-

tain the power to amend existing rules and regulations whenever he deems it necessary for the conservation of natural resources.

■ Union proposes an interpretation of the lease which, if accepted, would require us to find certain of its provisions invalid because inconsistent with the Act. If possible, however, we will construe terms of a Government lease so that they conform to the statute. See 3 Corbin, Contracts § 532 at 4 (1960); 1 McBride & Wachtel, Government Contracts § 2–120 (1972). So construed, we find no inconsistency between the terms of Union's lease and the provisions of the Act.

■ A lease may be terminated by its own terms in the event that stated conditions subsequent occur. After declaring itself subject to the provisions of the Act, the Union lease incorporates those regulations issued by the Secretary which are not inconsistent with specific terms of the lease. We construe the lease provision that certain regulations are incorporated ("made a part hereof") into the lease to express the drafters' intention that those regulations are ones whose violation is a condition subsequent rendering the lease voidable. We also construe it to refer only to regulations in existence at the time the lease was signed. This construction of the lease renders it fully consistent with the Act's declaration that "continuance in effect of any lease . . . shall be conditioned upon compliance with the regulations . . . in force and effect on the date of the issuance of the lease . . . ." 43 U.S.C. § 1334(a)(2).

■ The provision of the lease on which Union relies does not qualify the Secretary's power, under section 1334(a)(1), to issue regulations promoting protection of the environment after the lease has been executed. Those rules are

ing, vigorous regulation of Union's drilling, including suspension of its operations and of its installation of new platforms when appropriate. The costs to Union would be merely the loss of anticipated profits if its leases were cancelled, or postponement of those

not a part of the lease, their violation not a ground for cancellation. Although the lease does not recognize explicitly the Secretary's continuing power to regulate drilling operations, its acknowledgement that its terms are subordinate to provisions in the Act amply defers to the Secretary's statutory powers. We therefore find no inconsistency between the terms of the lease and the structure of the Act which authorizes it.

### "Natural Resources" Includes the Environment

■ The Act empowers the Secretary to prescribe rules necessary for "conservation of the natural resources of the outer Continental Shelf . . . ." 43 U.S.C. § 1334(a)(1). Whatever doubts may have existed in the past as to the construction of this phrase were resolved by our decision in Gulf Oil Corp. v. Morton, 493 F.2d 141 (9th Cir. 1973). The phrase encompasses all the natural resources of the shelf, not merely the mineral resources. The Secretary is responsible for conserving marine life, recreational potential, and aesthetic values, as well as the reserves of gas and oil.

■ *Gulf Oil's* construction of "natural resources" is reinforced by the terms of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq. NEPA directs that we construe the Outer Continental Shelf Act in light of Congress' desire to "create and maintain conditions under which man and nature can exist in productive harmony . . . ." 42 U.S.C. §§ 4331(a), 4332. NEPA's goals supplement the original goals of the Act. 42 U.S.C. § 4335. The Secretary has full authority to reconcile the objectives of the two statutes by regulating drilling under Government leases with an eye to the protection of the environmental quality of the continental shelf. Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91

profits if its operations were suspended. The equitable considerations which underlie application of estoppel dictate that the doctrine should not be applied in the circumstances of this case.

S.Ct. 873, 27 L.Ed.2d 808 (1971). *See* Calvert Cliffs' Coordinating Comm. v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1112–13 (1971); F. Anderson, NEPA in the Courts 271–74 (1973).

### Suspension: Regulation or Taking?

Pursuant to 43 U.S.C. § 1334(a)(1), the Secretary issued a regulation on August 22, 1969, authorizing emergency suspension of any operation which "threatens immediate, serious, or irreparable harm or damage to life, including aquatic life, to property, to the leased deposits, to other valuable mineral deposits or to the environment. Such emergency suspension shall continue until in his judgment the threat or danger has terminated." 30 C.F.R. § 250.12. Refusal to allow installation of a previously approved platform could be justified only as a suspension of operations under this regulation.

■ The regulation properly provides for "conservation of the natual resources of the outer Continental Shelf," as we have construed that phrase. Nevertheless, Union points to the distinction between a suspension and a revocation, asserting that the Secretary did not in fact merely suspend operations, because a suspension by definition possesses a "temporary nature." United Air Lines, Inc. v. CAB, 198 F.2d 100, 108 (7th Cir. 1952); see Western Air Lines, Inc. v. CAB, 196 F.2d 933, 935–36 (9th Cir.), cert. denied, 344 U.S. 875, 73 S.Ct. 167, 97 L.Ed. 677 (1952). The structure of the Act demonstrates that Congress intended vested rights under the lease to be invulnerable to defeasance by subsequently issued regulations. Although 30 C.F.R. § 250.12 provides expressly that a "suspension" shall be limited in time only by the Secretary's judgment that the environmental threat has ended, and although 43 U.S.C. § 1334(a)(1) authorizes regulations providing not only for

suspensions but for any other action affecting operations which the Secretary determines "necessary and proper" for "conservation of natural resources," Congress clearly did not intend to grant leases so tenuous in nature that the Secretary could terminate them, in whole or in part, at will.[3]

■ Congress itself can order the leases forfeited even now, subject to payment of compensation. But without congressional authorization, the Secretary or the executive branch in general has no intrinsic powers of condemnation. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 588, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); Hooe v. United States, 218 U.S. 322, 335, 336, 31 S.Ct. 85, 54 L.Ed. 1055 (1910). Congress' clear concern to distinguish police power regulation from invasion of property rights in these leases convinces us that Congress did not confer powers of condemnation upon the Secretary by implication.

■ The degree to which the Government may interfere with the enjoyment of private property by exercise of its police power without having to pay compensation is not a simple question. The courts, under a variety of tests, have recognized that regulation of private property can become so onerous that it amounts to a taking of that property. *See* Goldblatt v. Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958); Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). If, as Union contends, platform C is a necessary means for the extraction of oil from a portion of the leased area, refusal to permit installation of that platform now or at any time in the future deprives Union of all benefit from the lease in that par-

---

**3.** *See* Christopher, The Outer Continental Shelf Lands Act: Key to a New Frontier, 6 Stan.L.Rev. 23, 44 (1953):

"The potential lessees of outer Shelf land . . . realize that they are subject to police-power regulations which can

be modified from time to time. But they are sensitive to provisions that would give the United States power to change the *proprietary* regulations governing the lease after the issuance of a lease."

ticular area. We therefore conclude that an open-ended suspension of the right granted Union to install a drilling platform would be a pro tanto cancellation of its lease.

 Such a taking by interference with private property rights is within the constitutional power of Congress, subject to payment of compensation. *See* Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). But Congress no more impliedly authorized the Secretary to take the leasehold by prohibiting its beneficial use than by condemnation proceeding. A suspension for which the fifth amendment would require compensation is therefore unauthorized and beyond the Secretary's power.

Whether the Secretary has taken Union's property depends on the conditions of the suspension. If operations are suspended indefinitely, property rights have been taken. To determine whether the suspension is indefinite, or, on the other hand, is a temporary suspension whose termination is conditioned by the occurrence of certain future events, we must examine the justifications which the Secretary has offered for the suspension. The Secretary explained the suspension most recently in his statement of November 3, 1972:

The following were the primary factors that led to my decision denying the platform applications:

(1) construction of the proposed platform and drilling wells would increase the risk of oil pollution in the Santa Barbara Channel by reason of:

(a) the risks inherent in offshore oil drilling;

(b) location of the Channel in an active seismic belt; and

(c) with regard to Platform "C", the fact that the platform would be located on the damaged Dos Quadros [sic] structure;

(2) oil pollution in the Santa Barbara Channel would have adverse consequences, both short and longer term, because of the characteristics of the Channel environment; the following attributes of the Channel that would be affected by oil pollution were given particular consideration:

(a) animal and plant marine life;

(b) commercial and sport fisheries;

(c) recreational use;

(d) beaches and shore line of the Channel;

(e) birds;

(3) the lack of systems and equipment which are completely effective in controlling and removing oil pollution under all weather and sea conditions;

(4) the suitability of the Dos Quadros [sic] structure (leases OCS–P 0241 and 0240) for unitization and the suitability of leases OCS–P 0240 and 0166 for unitization;

(5) additional platforms would increase interference with other uses of the Channel for recreational and commercial fishing;

(6) additional platforms would be aesthetically undesirable.

 Factors 2, 4, 5, and 6 amount simply to a weighing of conflicting interests which the Secretary should have undertaken before the lease was granted. For the Secretary to offer these factors now to justify suspending Union's drilling activities asserts in effect that he can cancel the lease because he has changed his mind. These enumerated interests are not temporary concerns which the passage of time may eliminate.

 Factors 1 and 3, however, suggest conditions which the development of new technology or further study may lessen as threats to the environment. Further study of seismic risks in the Channel, or of the geology of the Dos Cuadros structure, for example, may produce evidence of environmental risks unanticipated at the time the lease was executed. Knowledge of these newly-discovered risks might induce Congress to cancel the lease. A suspension also might provide time for an improved pollution control technology to be devel-

oped. A suspension whose termination was conditioned on the occurrence of events or the discovery of new knowledge which can be anticipated within a reasonable period of time would be a valid exercise of the Secretary's regulatory power, and not a fifth amendment taking.

The vague assertion of potential risks advanced in the Secretary's 1972 statement is totally inadequate to enable this court to decide whether such justifications for a suspension do exist, however, and whether they sufficiently restrict the duration of the suspension to avoid the need for compensation. The trial court decided without explanation that the suspension deprived Union of no property rights. We are uncertain as to the basis for this conclusion.

In view of the insufficient nature both of the Secretary's explanation for the suspension and the district court's justification of its judgment, we vacate the decision of the district court and remand the case to the district court for a determination whether the Secretary is taking property rights from Union. The court should allow the Secretary to prepare and present an amended statement of the grounds on which he bases the suspension. *See* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); SEC v. Chenery Corp., 318 U.S. 80, 94–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The court may, at its discretion, receive additional evidence and testimony in support of and in opposition to the Secretary's amended justification. The court should then determine whether each justification advanced by the Secretary is appropriate under 30 C.F.R. § 250.12, whether the Secretary has offered sufficient evidence to demonstrate that his decision was not arbitrary and capricious or an abuse of discretion,[4] and whether the duration of a suspension based on the grounds offered is sufficiently conditioned on the occurrence of

future events to avoid fifth amendment requirements of compensation.

If the trial court finds that the suspension, as limited by the Secretary's amended statement, complies with these requirements, Union's complaint should be dismissed. Otherwise, the order of suspension should be set aside as beyond the Secretary's statutory powers. 5 U.S.C. § 706(2)(C).

 Because of the Secretary's continuing supervisory obligations, injunctive relief against further interference with Union's operations would be inappropriate.

Vacated and remanded.

---

4. 5 U.S.C. § 706(2)(A) provides the proper scope of review, as the district court concluded. The substantial evidence test is reserved for adjudications for which a formal hearing is required by law.