GEOPHYSICAL CORPORATION OF
ALASKA, Plaintiff,

v.

Cecil D. ANDRUS, Secretary of the Interior and Rodney A. Smith, Department of the Interior, Geological Survey, Oil and Gas Supervisor, Alaska Area, Defendants.

No. A78–27 Civil.

United States District Court,
D. Alaska.

May 25, 1978.

Supplemental Opinion July 24, 1978.

Robert Mintz, of Burr, Pease & Kurtz, Anchorage, Alaska, for plaintiff.

Alexander O. Bryner, U. S. Atty. for Alaska, Anchorage, Alaska by Rene J. Gonzalez, Asst. U. S. Atty., Laredo, Tex., for defendants.

## MEMORANDUM AND ORDER

von der HEYDT, Chief Judge.

THIS CAUSE comes before the court on cross motions for summary judgment. These motions present primarily an interpretation of certain provisions of the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331 *et seq.*

The OCSLA is a broad enactment of significant impact. See generally Christopher, *The Outer Continental Shelf Lands Act: Key to a New Frontier*, 6 Stan.L.Rev. 23 (1953). The provisions which concern the court in this action are section 5(a)(1), 43 U.S.C. § 1334(a)(1), and section 11, 43 U.S.C. § 1340.

Plaintiff is a corporation engaged in geophysical exploration of the Outer Continental Shelf (OCS). Geophysical exploration involves, generally, some form of magnetic or seismic measurement of the seabed. When coupled with geological exploration it is a necessary preliminary step leading toward the discovery of oil and gas deposits on the OCS. *See generally* 4 Summers, *Oil & Gas*, § 659.

Plaintiff conducts its business and generates earnings essentially under two types of arrangements. It may contract with an oil

company to test certain areas. In such situations the plaintiff is paid for the information gathered at a prearranged amount. The data collected is, in essence, the product of the company and is not generally available to the public.

As an alternative business practice the corporation may conduct geophysical exploration at its own risk without a prior contract to sell the data. This information apparently is then sold on the open market. This data is likewise plaintiff's business product and confidentiality is essential to

its value. *Ballard v. Claude Drilling Co.,* 149 Kan. 506, 88 P.2d 1021, 1023 (1939).

In 1976 the Secretary of the Interior promulgated certain regulations dealing with geophysical exploration of the OCS. Three of those regulations, 30 C.F.R. § 251.12(b), 30 C.F.R. § 251.13, and 30 C.F.R. § 251.14(c) are challenged herein. 30 C.F.R. § 251.-12(b) [1] provides in essence that a representative of the Secretary shall have the right to inspect the geophysical data collected and obtain copies of the data.[2] 30 C.F.R.

1. 30 C.F.R. § 251.12(b) provides:

(b) *Submission of geophysical data and processed geophysical information.* (1)Each holder of a permit for geophysical exploration shall notify the Supervisor immediately, in writing, of the acquisition, processing, or reprocessing of any geophysical data collected under the permit. At any time within one year after receiving a notice of acquisition, processing, or reprocessing from a permittee, or within a longer period if specified in the permit, the Supervisor may select all or part of the geophysical data, processed geophysical information, and reprocessed geophysical information. The permittee shall keep the geophysical data, processed geophysical information, and reprocessed geophysical information available for inspection and selection by the Supervisor during such period.

(2) The Supervisor shall have the right to inspect the geophysical data, processed geophysical information, or reprocessed geophysical information prior to selection in writing. This inspection may be performed on the permittee's premises or, if the Supervisor shall so request, the permittee shall deliver the geophysical data, processed geophysical information, or reprocessed geophysical information to the Supervisor for inspection. Such delivery shall be within 30 days after the request for delivery is received. At any time prior to selection in writing, the Supervisor shall have the right to return, without cost to the Government except for reproduction costs, any or all geophysical data, processed geophysical information, or reprocessed geophysical information following either inspection and detailed assessment of quality or establishment of price to the Government for processing or reprocessing. If the Supervisor decides to keep any or all of the geophysical data, processed geophysical information, or reprocessed geophysical information, he shall select them in writing; and if they are on the permittee's premises, the permittee shall submit them within 30 days after receiving a request for submission of them. The Supervisor shall have the right to arrange, by contract or otherwise, for the reproduction of geophysical data, processed geophysical infor-

mation and reprocessed geophysical information independently of the permittee and without reimbursement of the permittee for reproduction costs.

(3) In the event a permittee transfers geophysical data or processed geophysical information to a third party, or a third party who has received geophysical data or processed geophysical information directly or indirectly from a permittee transfers the geophysical data or processed geophysical information to another third party, the transferor shall notify the Supervisor of such transmittal and the transferor shall bind the third party, in writing, to the obligations of the permittee as specified in this Section.

(4) Each submission of geophysical data, processed geophysical information and reprocessed geophysical information shall, at the direction of the Supervisor, contain all or part of the following:

(i) An accurate and complete record of each geophysical survey conducted under the permit including final location maps of all survey stations; and

(ii) All common depth point and high resolution seismic data developed under a permit in a format and of a quality suitable for processing; processed geophysical information derived therefrom with extraneous signals and interference removed, in a format and of a quality suitable for interpretive evaluation, reflecting state-of-the-art processing techniques; and other geophysical data and processed geophysical information obtained from, but not limited to, shallow and deep subbottom profiles, bathymetry, side-scan sonar and magnetometer systems, bottom profiles, gravity and magnetic surveys and special studies such as refraction and velocity surveys.

(5) A permittee shall not be required to submit interpreted geophysical information under this Part of Title 30 unless specifically required by this Part.

2. The term "Supervisor" used in the regulation is defined in 30 C.F.R. § 251.3(e), as the Secretary's representative or subordinate of the representative.

§ 251.13 [3] provides compensation for the above data. That compensation covers reproduction and processing costs only "as distinguished from the cost of data acquisition." 30 C.F.R. § 251.13(b). Finally, 30 C.F.R. § 251.14(c) [4] establishes that at a future time this information will be disclosed to the public.

Thus, plaintiff's motivation in this action is readily apparent. Its business product is confidential information and these regulations provide the Secretary and, at some future time, the public with access to the information with no reimbursement for the expense entailed in gathering the data.[5] Two basic challenges are leveled at the regulations. The first is that they are in contravention of the OCSLA. The second is that their operation constitutes an unauthorized taking of property without just compensation.[6] Jurisdiction is predicated expressly upon 43 U.S.C. § 1333(b). Whether or not that section can confer jurisdiction in this case it is clear that 28 U.S.C. § 1331(a) is an appropriate jurisdictional base. Plaintiff seeks declaratory and injunctive relief.

*Statutory Authorization*

The first area of attack upon the regulations is that they are not authorized by the OCSLA and/or they are inconsistent with that Act. To understand fully the basis for the claim and defendants' response, two

---

**3.** 30 C.F.R. § 251.13 provides:

(a) *Reimbursement for reproduction costs.* After the delivery or submission of geophysical data, processed geophysical information and reprocessed geophysical information in accordance with § 251.12(b)(2), the permittee or third party shall, upon a request for reimbursement and upon a determination by the Supervisor that the request is proper, be reimbursed for the cost of reproducing the geophysical data, processed geophysical information and reprocessed geophysical information at the permittee's lowest rate or at the lowest commercial rate established in the area, whichever is less.

(b) *Reimbursement for processing or reprocessing costs.* After the Supervisor selects in writing processed and reprocessed geophysical information in accordance with § 251.12(b)(2), the permittee or third party shall, upon a request for reimbursement and upon a determination by the Supervisor that the request is proper, be reimbursed for the cost attributable to processing and reprocessing only, as distinguished from the cost of data acquisition. The amount of reimbursement will not exceed the lowest rate available to any purchaser. If the processed and reprocessed geophysical information is not available for sale and the permittee or third party is the only participant, the permittee or third party shall be reimbursed for not more than one-half of the processing and reprocessing cost incurred by the permittee or third party. The permittee or third party shall refund to the United States any amount by which the lowest share of the total processing and reprocessing cost is reduced following reimbursement to the permittee or third party by the United States.

(c) *Procedures for establishing amount of reimbursement.* If a permittee or third party intends to request reimbursement under this section, he shall submit to the Supervisor a request for reimbursement which specifies the cost of reproducing the geophysical data, processed geophysical information and reprocessed geophysical information or the cost of processing or reprocessing the geophysical data. The request shall be submitted at the time the permittee or third party delivers for inspection geophysical data, processed geophysical information or reprocessed geophysical information or upon demand by the Supervisor if the inspection is on the permittee's or third party's premises. Any reimbursement to a permittee or third party shall be conditioned upon a determination by the Supervisor that the request for reimbursement as originally submitted or as revised is proper. Reimbursement procedures shall be in accordance with applicable laws and regulations.

**4.** 30 C.F.R. § 251.14(c) provides:

(c) *Disclosure of geophysical data, processed geophysical information and interpreted geophysical information.* The Supervisor shall disclose geophysical data, processed geophysical information, reprocessed geophysical information and interpreted geophysical information submitted under a permit and retained by the Supervisor as follows: (1) He shall make available to the public geophysical data 10 years after the issuance of the permit. (2) He shall make available to the public processed geophysical information, reprocessed geophysical information and interpreted geophysical information 10 years after it has been submitted to the Supervisor.

**5.** There appears to be no issue concerning standing as certain requests for information have already been made of plaintiff.

**6.** This point is treated as two issues by plaintiff. The first is whether the taking is authorized and the second is the issue of just compensation.

sections of the Act are important. Section 11 of the OCSLA specifically deals with geophysical exploration. It states that:

> Any agency of the United States and any person authorized by the Secretary may conduct geological and geophysical explorations in the outer Continental Shelf, which do not interfere with or endanger actual operations under any lease maintained or granted pursuant to this subchapter, and which are not unduly harmful to aquatic life in such area.

Three matters concerning this section are apparent and undisputed. The Secretary must authorize any geophysical exploration on the OCS and such exploration may not interfere with preexisting leases nor endanger aquatic life. The focus of this portion of the controversy is over what other matters may be considered in authorizing geophysical exploration. Plaintiff takes the position that interference with preexisting leases and danger to aquatic life are the Secretary's only legitimate concerns in granting geophysical exploration authorizations. The Secretary takes the position that these factors are the only ones which must be considered but that others consistent with his duties under the Act may also be considered in granting authorizations. In relation to these regulations the Secretary relies on section 5(a) of the Act which provides, *inter alia*, that

> The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf . . . .

Plaintiff does not contend that these regulations are not helpful to the Secretary in discharging his responsibilities pursuant to section 5(a)(1). *See generally State of Fla. v. Mathews*, 526 F.2d 319, 323 (5th Cir. 1976). Nor does it appear that the Secretary contends that these regulations in any manner relate to his duty to avoid interference with preexisting leases and protect aquatic life. The issue which is presented, therefore, is whether section 5(a)(1) based

regulations generally can qualify a section 11 authorization.

The competing contentions in this regard are quite straightforward. Plaintiff's argument is based in substantial part upon the legislative history of section 11. The genesis of that section is found in section 17 of H.R. 5134. Section 17 of H.R. 5134 recognized the *right* of any person, subject to applicable provisions of law, to conduct geophysical exploration which did not interfere with leases issued under the Act. *See* House Report No. 413, 2 U.S.Code Cong. and Admin.News, 83rd Cong. First Sess., pp. 2177, 2183 (1953). The Senate Bill, S. 1901, contained no comparable provision. In commenting on the two proposals an Assistant Attorney General stated:

> The House Bill . . . recognizes the right of any person . . . to conduct . . . geophysical explorations that do not interfere with or endanger actual operations under any lease issued pursuant to the act. Such provision may be desirable, but might well be conditioned on securing a permit from the Secretary . . . rather than leaving it to the individual . . . to decide what will interfere with or endanger operations.

S.Report No. 411 to accompany S. 1901, p. 39 (1953). Apparently in response to this suggestion the change was made in section 17 of H.R. 5134 and that section became section 11 of the OCSLA. No mention was made of this change in the Conference Report. *See* U.S.Code Cong. and Admin. News, *supra*, at 2184–85.

Relying upon this legislative history plaintiff asserts that the only purpose for the Secretary's authorization under section 11 is to consider the impact on leases and aquatic life. It then contends that as these regulations are not relevant to those purposes that they are invalid. The court agrees that regulations which are inconsistent with their purported statutory authority cannot be upheld. *Dixon v. United States*, 381 U.S. 68, 74, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965); *Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270

(1974); *Sealaska v. Roberts*, 428 F.Supp. 1254, 1260 (D.Alaska 1977). However, the court concludes that these regulations do not fall within that general prohibition.

It is true, as plaintiff contends, that the history of section 11 indicates a less sweeping regulatory power under its terms than that asserted in these regulations. If this court were conducting a de novo review of the regulations and statutes it might well conclude that the most reasonable construction would require section 11 to stand alone.[7] That, however, is not the court's function in reviewing administrative action such as this.

■ The construction of the statute adopted by the Secretary is entitled to great deference. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964); *Doyon v. Bristol Bay*, 569 F.2d 491, 496 (9th Cir. 1978); *Cf. Vermont Yankee Nuclear Power Corp. v. N.R.D.C.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Plaintiff contends that this standard of review is not appropriate citing, *Robinson v. Vollert*, 411 F.Supp. 461, 475 (D.Tex.1976). *Robinson* held that the "canon of construction does not apply to an administrator's construction of a statute delegating his own powers." This court must disagree. The Ninth Circuit has utilized the canon in such situations. *See e. g., U. S. v. Boyd*, 491 F.2d 1163 (9th Cir. 1973).

■ The construction of the statute adopted by the Secretary is not facially inconsistent with the OCSLA nor does it contravene any general policy of the Act. The Ninth Circuit has noted the broad power of the Secretary to conserve resources

under section 5(a)(1) of the Act. *Union Oil Co. of Calif. v. Morton*, 512 F.2d 743, 749 (9th Cir. 1975), *see also Alaska v. Andrus*, 188 U.S.App.D.C. ——, 580 F.2d 465, n. 55 (1978). As previously noted it is not contended that these regulations are inappropriate for the purpose, nor is it asserted that they exceed the Secretary's "general managerial powers over the public lands." *Alaska v. Andrus, supra* at ·——, 580 F.2d at 483. The interpretation adopted by the Secretary may not be the most reasonable interpretation but it does not appear totally unreasonable.[8]

The court notes plaintiff's contention that the broad powers of section 5(a)(1) relate only to leases. Although contained in a section dealing primarily with leases the powers in the second sentence of that section can be construed to not be so circumscribed. On this issue, too, the Secretary's opinion is not unreasonable.

As a final matter the court concludes that the subsequent legislation introduced in March, 1974, and not passed is of little value in interpreting the Act. That legislation, S. 3221, would have granted specifically the right the Secretary asserts in these regulations. Aside from the difficulties inherent in utilizing subsequent legislation to construe prior Acts, *U. S. v. Mine Workers*, 330 U.S. 258, 281–82, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *U. S. v. Philadelphia Nat. Bank*, 374 U.S. 321, 348–49, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), this legislation is ambiguous. It is not possible to ascertain whether the specific delineation of this power is an expansion or mere clarification of presently existing authority. Thus, it is of little

---

**7.** Even if the court were to read section 11 in a manner identical to section 17 of H.R. 5134 the Secretary's construction would appear to be reasonable. While section 17 did not have a requirement for authorization it did require that geophysical exploration be conducted subject to applicable provisions of law. These regulations could perhaps be construed as such provisions and thus, properly applied even under that proposed section.

**8.** The court cannot accept defendants' framing of the issue which states "[i]s it reasonable to suppose that Congress intended the Secretaries of the Interior and Defense to make their deter-

minations as to the best value of the resources or the tracts which should be reserved in the national interest, and yet conclude that Congress forbade the Executive Branch from obtaining the information necessary to carry out these functions?" Memo. at 18. Clearly Congress provided the Secretaries with the means to obtain the information by authorizing specifically in section 11 their ability to explore geophysically. Thus they have at least one Congressionally approved manner to obtain this information. The issue is whether they may use this alternate manner of data collection.

value. Accordingly, the court concludes that section 5(a)(1) authorized regulations may modify section 11 geophysical exploration authorizations. `

*Unauthorized Taking Without Just Compensation*

Plaintiff's second area of attack upon these regulations is that their operation constitutes an unauthorized taking of property without just compensation. This general area breaks down into two separate issues. The first is whether the "taking" is authorized. The second concerns the issue of just compensation. The court considers these questions in inverse order.

■ Plaintiff contends that the "taking" of this property without payment for costs of acquisition raises the constitutional issue of a taking without just compensation. It seeks declaratory relief. Defendants' response to this contention is that such a claim properly is presented in the Court of Claims in a suit for damages under the Tucker Act [9] and that the existence of this remedy eliminates the constitutional claim. The court agrees with this statement of the law.

In the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), the Court concluded that a statute which might otherwise authorize an unconstitutional taking was saved from a constitutional challenge because of the availability of the Tucker Act remedy. *Id.* at 134–36, & 148, 95 S.Ct. 335; *see also* (Sp.Ct. R.R.R.A.1974) 384 F.Supp. 895, 943–44. In response to this argument plaintiffs assert that 43 U.S.C. § 1333(b) [10] withdraws Tucker Act jurisdiction in cases involving the OCSLA.

A similar contention was made in the *Regional Rail Reorganization Act Cases, supra,* and the Court set forth the test to be employed to determine whether a later enacted jurisdictional statute withdraws the Tucker Act remedy. The test is whether the two statutes are positively repugnant or the intention to withdraw the Tucker Act remedy is clearly expressed. *Id.* 419 U.S. at 133–34, 95 S.Ct. 335; *see generally Id.* at 127–36. Here it is clear that 43 U.S.C. § 1333(b) fits neither of these modes and the court concludes that the Tucker Act is available as a remedy for any taking.[11] This conclusion precludes plaintiff's constitutional challenge.

■ Plaintiff's other contention with regard to the "taking" issue is the question whether this "taking" is authorized. In considering the constitutional question the Court in the *Regional Rail Reorganization Act Cases* referred to authorized takings. *Id.* at 126–27, 95 S.Ct. 335. The Court made it absolutely clear that the actions therein were authorized and that the Court of Claims remedy does not exist for an unauthorized taking. *Id.* at 127 n. 16, 95 S.Ct. 335. Plaintiff asserts that the "taking" of its property under these regulations is an exercise of the power of eminent domain which is not authorized under the OCSLA.[12]

9. At oral argument plaintiff's counsel stated that any such claim would exceed $10,000 in controversy. Hence, it would be beyond this court's Tucker Act jurisdiction.

10. 43 U.S.C. § 1333(b) provides:
(b) The United States district courts shall have original jurisdiction of cases and controversies arising out of or in connection with any operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing or transporting by pipeline the natural resources, or involving rights to the natural resources of the subsoil and seabed of the outer Continental Shelf, and proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the adjacent State nearest the place where the cause of action arose.

11. The court does not pass upon the issue whether a suit for damages could also be maintained in this court under 43 U.S.C. § 1333(b). In any event the existence of that remedy would also preclude the constitutional challenge.

12. Although the court has concluded that the regulations are authorized in the general sense that section 5(a)(1) regulations may modify section 11 authorizations, that holding does not address the question presented here on the Secretary's authority to condemn property.

The Ninth Circuit has expressly held that the Secretary has no general power of eminent domain under the OCSLA. *Union Oil Co. of Calif. v. Morton*, 512 F.2d 743, 751 (9th Cir. 1975). In *Union Oil* the court was faced with the question whether a suspension of drilling activities in the Santa Barbara channel was a taking or a regulation. To the extent it was a taking the regulations were declared invalid as beyond the Secretary's powers. *Id.* at 752. Similarly, if these regulations constitute a "taking" as that term is used in the concept of condemnation, these regulations would be invalid. The question in *Union Oil*, however, involved a more conventional application of the concept of the power of eminent domain. The issue in the present case does not appear to be as clear a situation and the court requires further briefing and factual presentation on two points.

The first question is whether there has been a "taking" as that term is used in the context of eminent domain. It is clear that defendant's regulations authorize the physical appropriation and publication of plaintiff's product. It is also clear that such products may be subject to condemnation. *Cf. Nixon v. Administrator of General Services*, 408 F.Supp. 321, 355–56 n. 49 (D.D.C. 1976), aff'd. 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). [Power of eminent domain extends to product of intellectual activity-Presidential papers]; *Porter v. United States*, 473 F.2d 1329 (5th Cir. 1973) [Papers of Lee Harvey Oswald]; *U. S. v. Howe*, 26 Fed. cases no. 15,404a (W.D.Ark. 1880) [Services of medical expert at trial]. Here, however, because of the somewhat unique nature of this case it is unclear to the court whether a condemnation or taking has occurred.

As a related issue, to the extent these regulations may present the classic taking/regulation question, *see Union Oil, supra*, at 750, evidence on the extent of the damage to plaintiff's property rights should be presented.[13] *Cf. Id.* at 752. This evidence may also prove useful to determine whether this appropriation constitutes a "taking" irrespective of the question of taking/regulation.

*Other Matters*

■ Two other contentions were made by the Secretary. He contends that the right to require this data has been confirmed by subsequent appropriations with some mention of these regulations. The doctrine of ratification by appropriation is not favored, however, and in the present case the facts do not show sufficient knowledge on the part of Congress to warrant its application. *Maun v. United States*, 347 F.2d 970, 978 (9th Cir. 1965).

■ The second contention is that the Secretary can impose these regulations by contract. For this proposition defendant cites *State of Alaska v. Andrus*, 188 U.S. App.D.C. ——, ——, 580 F.2d 465 (1978). In that case the court held that the power to include termination clauses in leases could be conferred by contract. The court stated that operation of such a clause would not constitute a taking. *Id.* at ——, 580 F.2d at 484. It noted that inclusion of such a clause would probably decrease the value of the lease. *Id.* The court properly distinguished *Union Oil, supra*, on the basis that where the lease suspension clause was included in the contract it was the terms of the contract rather than a subsequent government action which caused lease suspension. The situation herein is not analagous.

In the case of leases the termination clause was bargained for. As noted by the D.C.Circuit inclusion of such a clause would probably decrease the value of the lease. Here the Secretary collects nothing for the grant of the authority to conduct geophysical exploration. The costs of such exploration is the same with or without the regulation. The explorer is required to accept these terms or to forego exploration and there apparently is no bargaining process

---

**13.** As it appears that there has been an appropriation of property rather than a regulation of property the court does not perceive this issue to be present in this case. As it was not briefed, however, the opportunity to present evidence is left open at this time.

whereby it receives some benefit for the intrinsic value of the property acquired. Hence, the court cannot accept the "contract" analysis.[14]

Accordingly, IT IS ORDERED:

1. THAT the motions for summary judgment are granted in part and denied in part in conformity with this memorandum.

2. THAT on or before June 5, 1978, plaintiff submit a memorandum and evidence on the "taking" issues outlined in this memorandum. Defendant may have 10 days from the date of service in which to submit materials in opposition. Plaintiff may have 5 days in which to submit a reply. Oral argument is not contemplated.

## SUPPLEMENTAL OPINION

THIS CAUSE comes before the court following supplemental briefing upon certain issues. Oral argument was requested on the issues presented in this supplemental briefing and that request is denied in order to expedite the business of the court. Local Rule 5(C)(1). In the memorandum and order of May 25, 1978, *supra*, at 368, the court requested further briefing on the question whether the regulations at issue in this litigation result in a "taking" of property as that term is used in the concept of eminent domain.

■ At the outset the government asserts that any inquiry into the taking question impermissibly impinges upon the jurisdiction of the court of claims citing *inter alia*, *Warner v. Cox*, 487 F.2d 1301 (5th Cir. 1974), and *Carter v. Seamans*, 411 F.2d 767 (5th Cir. 1969). Those cases and the theory upon which they are based are inapposite to the present situation. *Warner, Carter,* and other similar cases, *see Mathis v. Laird*, 483 F.2d 943 (9th Cir. 1973), stand for the proposition that when a court of claims remedy exists and a suit is brought in the district court for declaratory relief and money damages in excess of $10,000, that the district

court should defer jurisdiction. In each of those cases the court found Tucker Act jurisdiction. The government contends that as this court has held that section 5(a)(1) regulations may modify section 11 authorizations that these regulations are authorized and any further action for just compensation must be presented in the court of claims. *See Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). It characterizes the suit as an action for inverse condemnation. This contention, however, overlooks an important second determination made by this court in its prior memorandum.

In that memorandum the court concluded in the general sense that section 5(a)(1) regulations may modify section 11 authorizations. Speaking more specifically, however, the court relied upon *Union Oil Co. of Calif. v. Morton*, 512 F.2d 743, 751 (9th Cir. 1975), for the proposition that the Secretary has no general power of eminent domain under the OCSLA. Thus, the court noted that although the regulations at issue are authorized in the general sense that section 5(a)(1) regulations may modify section 11 authorizations the question of the Secretary's authority to condemn property was not answered by that holding. *See* memorandum of May 25, 1978, *supra*, n. 12.

The Supreme Court in the *Regional Rail Reorganization Act Cases, supra,* stated explicitly that the Tucker Act remedy is not available for unauthorized takings. 419 U.S. at 127 n. 16, 95 S.Ct. 335. *See Hooe v. United States*, 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055 (1910). The Ninth Circuit in *Union Oil* held that the Secretary has no general power of eminent domain under the OCSLA. Thus, any regulations which constitute a taking are not authorized. Resolution of this issue is central to the applicability of the *Regional Rail Reorganization Act Cases, supra,* and those cases which refuse to consider claims when the Tucker Act remedy exists.[1] The issue of this authoriza-

---

14. The inapplicability of this theory is even more clear with respect to the application of these regulations to authorizations acquired prior to the date regulations were enacted.

1. This court notes that resolution of this issue in either direction will preclude relief in the court of claims and, hence, there is no issue of this court impinging on that court's jurisdic-

tion has existed in this case from the outset. As a final matter the court notes that plaintiff herein has not sued for monetary relief. *See Duke Power Co. v. Carolina Env. Study Gp.,* —— U.S. ——, n. 15, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

## Taking

■ The government's initial approach to the taking issue is the assertion that as a matter of law no taking has occurred. It relies on various theories which are closely intertwined for this proposition. The court will examine these theories and the cases upon which they are based.

The first theory is that in granting the exploration permit the government has retained a portion of its own property in the form of the geophysical data. Thus, the argument goes, the government has not taken plaintiff's property but merely retained its own property when transferring the right to explore to the plaintiff. This analogy is not sound.

The government in this case did not give to plaintiff geophysical data. It gave the right to explore for that data. The government has not retained a portion of the privilege granted such as it might retain an easement over land granted. Rather, in a more proper analogy, it has granted a right, such as an interest in land, and then attempted to acquire the benefits of plaintiff's efforts in utilizing that right, such as a crop.

The government cites *United States v. Cors,* 337 U.S. 325, 334, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949), and *United States v. Fuller,* 409 U.S. 488, 491, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973), for the proposition that no taking has occurred. Those cases held that no compensable taking occurs when the value of the property taken is enhanced by the government's action. In *Cors* the Court held specifically that the increased value of a vessel due to a government acquisition program did not constitute a proper element of just compensation. In *Fuller*

the Court concluded that the value added to condemned land by a revokable permit could not be considered in fixing just compensation.

Both of the above cases are based on the general premise that it would not be fair to require the government to pay for property when the government has created the value in that property. The case at bar is distinguishable. The government granted the exploration permits. Had it sought to revoke those permits the cases just cited would be more on point. Here, however, the private individual has utilized the permit to create a product. The product was not granted by the government, the government did not assist in its development, it does not appear that government activity has enhanced its value, and continued use of the permit is not essential to its value. Hence, the government is not being required to pay for a product which has value only because of government activity or largess. Although the opportunity to acquire the property may have originated in such action the property itself is one step beyond the impact of these rules. *See also Johnson v. United States,* 479 F.2d 1383, 202 Ct.Cl. 405 (1973).

The government cites *Ivanhoe Irrig. Dist. v. McCracken,* 357 U.S. 275, 295, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958), for the proposition that the federal government may impose and establish reasonable conditions relevant to federal interests in certain projects. While the law as stated certainly is true it does not allow the Secretary herein to condemn property. *See Union Oil, supra.*

The government contends that the regulations at issue constitute a proper exercise of the police power for which no compensation is required. Thus, the government relies upon the taking/regulation doctrine mentioned by the court in its earlier memorandum. *Supra* at n. 13. Although the bounds of the police power can be described

tion. If it is determined that there is a taking the court of claims would have no jurisdiction as such a taking is not authorized. If there is

no taking there is no act for which compensation is constitutionally compelled.

more readily than they can be defined, *Mid-Way Cabinet Fixture Mfg. v. County of San Joaquin*, 257 Cal.App.2d 181, 65 Cal.Rptr. 37, 40 (1968), and in some contexts the question of taking/regulation presents issues of fact, *Scrutton v. County of Sacramento*, 275 Cal.App.2d 412, 79 Cal.Rptr. 872, 879–80 (1969), the court concludes as a matter of law that the appropriation of this material is not the regulation of the property. Nichols provides a convenient working distinction between the exercise of eminent domain, or taking, and an exercise of the police power, or regulation.

> The distinguishing characteristic between eminent domain and the police power is that the former involves the *taking* of property because of its need for the public use while the latter involves the *regulation* of such property to prevent the use thereof in a manner that is detrimental to the public interest. (Emphasis in original—footnotes omitted).

1 Nichols' on Eminent Domain, § 1.42, pp. 1–104; *see also Pope v. City of Atlanta*, 418 F.Supp. 665, 668 (N.D.Geo.1976). It is clear that these regulations were not imposed to prevent the use of this property in a manner which is detrimental to the public interest. Nor does it appear that this case is analogous to the "forced dedication" situation. *See Nichols, supra*, § 6.3511[2], pp. 6–104.3–6.104–4. In short, this case does not present the court with a question involving the regulation of property.

The government cites *Utah Power and Light Co. v. Morton*, 504 F.2d 728 (9th Cir. 1974), for the proposition that no taking has occurred. In *Utah Power* the plaintiff challenged regulations which provided the government the right to utilize surplus power transmission lines when the lines were constructed over public lands. In speaking to the taking question presented therein the court concluded that no taking without just compensation occurred as the

Secretary was bound to pay "an equitable share" of the costs. *Id.* at 740. The court did not state that no taking occurred, rather it concluded that there was no taking without just compensation. Indeed, by its reference to just compensation one might infer that the court found a taking for which just compensation was required.

Plaintiff asserts that the government may not avoid the proscriptions of the fifth amendment by attaching these conditions to the permit to explore citing, *inter alia*, *Mid-Way Cabinet Fixture Mfg. v. County of San Joaquin*, 257 Cal.App.2d 181, 65 Cal.Rptr. 37, 42 (1968), and *Scrutton v. County of Sacramento*, 275 Cal.App.2d 412, 79 Cal. Rptr. 872, 879 (1969). It is not necessary to determine the applicability of those cases, however, as the Ninth Circuit has spoken more directly to the attachment of conditions question presented herein.

In *Portland General Electric Co. v. Federal Power Com'n.*, 328 F.2d 165 (9th Cir. 1964), the court was presented a challenge to certain conditions imposed upon owners and operators of hydroelectric facilities. The plaintiffs therein had received a license to operate these facilities and the licenses contained clauses requiring the licensee to convey "free of cost" certain property belonging to the licensee. *Id.* at 169 n. 5. In upholding this condition upon the license the court stated:

> Nor is it a taking for the Government to impose financial obligations upon the recipient of a benefit if, as here, the benefit may be declined.

*Id.* at 173; 2 *Nichols, supra*, § 6.1 at n. 9.1; *see also Fox River Co. v. R.R. Comm.*, 274 U.S. 651, 655, 47 S.Ct. 669, 71 L.Ed. 1279 (1927).[2]

The present case presents an analogous situation. Permission from the Secretary is required prior to any geophysical exploration. The Secretary may consider his obli-

---

2. While a somewhat contrary rule may be found in *Frost Trucking Co. v. R. R. Com.*, 271 U.S. 583, 593, 46 S.Ct. 605, 70 L.Ed. 1101 (1926) one Justice of the Supreme court has noted the demise of the precedential value of that case. *See Watson v. Employers Liability*

*Corp.*, 348 U.S. 66, 82 n. 3, 75 S.Ct. 166, 99 L.Ed. 74 (1954) (Frankfurter, J., concurring); *but see Parden v. Terminal R. Co.*, 377 U.S. 184, 193 n. 11, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964).

gation to conserve resources in granting such permits. The recipient of this benefit must accept the financial burden of these conditions which relate to the conservation of resources and imposition of such conditions are not a taking. *Portland General Electric Co., supra.*

As there has been no taking in this case the regulations are valid.

Accordingly IT IS ORDERED:

THAT defendant's motion for summary judgment is granted. The clerk may prepare an appropriate judgment form.